No.   94-177

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

IN RE THE MARRIAGE OF

CATHERINE A. McNELLIS,

     Petitioner and Respondent,

  and

ROBERT F. McNELLIS,

     Respondent and Appellant.

APPEAL FROM: District Court of the First Judicial District,
In and for the County of Lewis and Clark,
The Honorable Jeffrey Sherlock, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

      Thomas F. Dowling, Dowling Law Firm,
      Helena, Montana

    For Respondent:

      John Hollow, Attorney at Law,
      Helena, Montana

FILED

NOV 21 1994

Filed:

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs: August 25, 1994

Decided: November 21, 1994

Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Robert (Bob) McNellis appeals the judgment of the First Judicial District Court, Lewis and Clark County, dissolving the parties' marriage and distributing the marital estate. We affirm.

The issues on appeal are:

1. Did the District Court properly estop Bob from changing his position at trial regarding the value of the recycling machine investment?

2. Was the District Court's valuation of the marital assets clearly erroneous?

3. Was the District Court's distribution of the marital estate clearly erroneous?

Bob and Cathy were married on December 29, 1967, in Fort Knox, Kentucky. About two years later, the couple moved from Kentucky to Indiana, where Bob worked for Corning Glassworks and obtained a masters degree in management. Bob was subsequently transferred to Pennsylvania. During these early years of the marriage, Cathy taught both high school and grade school, substitute taught, and worked as an office manager. In 1975, Bob left Corning Glassworks, and the couple moved to Helena where Bob obtained employment with the Federal Reserve Bank.

Three children were born of the marriage. During the marriage, Cathy did most of the housecleaning and cooking and was the primary caretaker of the children. She also attended classes at Carroll College, and received a degree in accounting in 1983. After a nine year absence from the work force, she returned to work

2

part-time as an accountant/office manager. By 1986 or 1987, her part-time job evolved into a full-time position. At the time of the petition for dissolution, she earned an annual salary of $39,600.

Bob's employment with the Federal Reserve Bank ended in 1989. During his employment with the bank, Bob invested money in both a Federal Reserve Thrift Plan and a Retirement Plan. At the time of the petition for dissolution, the Retirement Plan was worth $76,720, and the Thrift Plan was worth about $103,000, less an outstanding loan balance of about $13,000.

After his discharge from the bank, Bob worked as a consultant for Independent Bank Service Corporation and as an adjunct professor of economics at Carroll College. During his semester at Carroll College, Bob developed a plan for a private business venture called Advanced Industrial Concepts and Coating (AIC).

AIC consists of two separate entities: a corporation (AIC, Inc.) and a partnership (AIC Properties). AIC, Inc., deals with the actual coating of products. AIC Properties deals with the acquisition and maintenance of the property on which AIC, Inc., is located. Cathy and Bob brought in Gary and Kathy Dagel, and in June 1990, the four became stockholders of AIC, Inc., and partners in AIC Properties. Each couple contributed cash or property in the amount of $45,000 as start-up capital. According to Bob's testimony, the finances of the partnership and the corporation were not carefully separated, and frequently intermingled.

Cathy and Bob borrowed $34,000 from the Thrift Plan and loaned that amount to AIC, Inc., to put toward the purchase of the Steffick Building located on North Main Street in Helena. The partnership obtained a mortgage and acquired the building. At the time of the hearing, an outstanding balance of approximately $186,000 remained on the building loan.

In September 1991, Bob signed a five year lease agreement with Dwayne Anderson, owner of Recycle Technologies of Billings, for a recycling machine known as a "cash can." Bob paid $30,000 for the lease. The cash can is shaped like a large soda can and typically is set up in parking lots of busy supermarkets. People insert recyclable aluminum cans into the machine which electronically keeps track of the weight of the cans and then pays out a certain amount of money according to the weight. In theory, the operator of the cash can generates income from the subsequent sale of the aluminum cans to a central recycling facility. According to Anderson's testimony, the plan was for Bob to recover his initial investment of $30,000, plus additional profits, over the term of the five year lease.

In April 1992, the Daqels gave notice that they were withdrawing from AIC, Inc., and AIC Properties. The McNellises and the Daqels entered into arbitration in November 1993. They reached an agreement whereby Bob would pay them $55,000 for their one-half interest, provided that Bob could obtain financing on or before February 9, 1994. The agreement provided that if Bob could not raise the money to buy the Daqels out, the Daqels would be allowed

4

to sell AIC, including the Steffick Building, and retain their one-half of the proceeds. If they had to sell the building, the agreementprovidedthatthe initial asking price would be $334,000, and if it did not sell, the asking price could be incrementally reduced, but in no event less than $300,000. The agreement further provided that the proceeds of the sale would be used to pay off the mortgage, to cover any realtor's commission and title insurance, and to repay the balance of the Thrift Plan loan owed to the McNellises.

Cathy petitioned for dissolution of the marriage on December 11, 1992. The District Court heard the matter on November 24, 1993. At the hearing, both parties testified to the value of the marital assets and debts. At issue on appeal is the value of three particular items--Recycle Technology, AIC Properties, and the Federal Reserve Thrift Plan--and the final division of the marital estate.

The District Court issued findings of fact, conclusions of law, and order on January 7, 1994, and entered judgment on January 18, 1994, distributing the marital assets and debts as follows:

|  | Cathy | Bob |
|---|---|---|
| Assets |  |  |
| (1) Residence | $117,500 |  |
| (2) Condominium Contract for Sale | 11,000 |  |
| (3) Recycle Technology |  | $30,000 |
| (4) Household goods | 7700 |  |
| (5) 1988 Buick | 3500 |  |
| (6) 1984 Ford | 1000 |  |
| (7) 1987 Oldsmobile |  | 1500 |

5

|      |                          |           |           |
|------|--------------------------|-----------|-----------|
| (8)  | Federal Reserve Thrift Plan | 90,344  |           |
| (9)  | Galusha Retirement       | 18,366    |           |
| (10) | Prudential Life Insurance Policy | 6136 |     |
| (11) | Federal Reserve Retirement |         | 76,720    |
| (12) | AIC, Inc.                |           | 0         |
| (13) | AIC Properties           |           | 81,000    |
| (14) | AIC Loan                 |           | 13,430    |
|      | Total Assets             | $255,546  | $202,650  |
|      | Percent of Total         | 56%       | 44%       |

Debts

|     |                          |           |           |
|-----|--------------------------|-----------|-----------|
| (1) | Mortgage on Residence    | 82,000    |           |
| (2) | Post-separation Credit Card debt | 4392 |       |
| (3) | Property Taxes           | 1000      |           |
| (4) | Valley Bank debt         |           | 8100      |
| (5) | AIC credit line          |           | ??        |
| (6) | Bank America debt        |           | ??        |
| (7) | First Bank debt          |           | 6500      |
| (8) | Pre-separation Credit Card debt |    | 1958      |
|     | Total Debts              | $ 87,392  | $ 16,558  |
|     | Percent of Total         | 84%       | 16%       |

| NET DISTRIBUTION | $168,154 | $186,092 |
|------------------|----------|----------|
| PERCENT OF TOTAL | 47%      | 53%      |

On January 28, 1994, Bob moved the District Court to amend its findings and conclusions. The District Court denied the motion. Bob filed notice of appeal on April 11, 1994.

ISSUE 1

Did the District Court properly estop Bob from changing his position at trial regarding the value of the recycling machine investment?

When this Court reviews a district court's conclusions of law, we are not bound by the district court's conclusions and are free to reach our own. In re Marriage of Danelson (1992), 253 Mont. 310, 317, 833 P.2d 215, 219. Our determination on appeal is simply whether the district court correctly or incorrectly applied the law. Danelson, 833 P.2d at 220 (citing Steer, Inc. v. Dept. of Revenue (1990), 245 Mont. 470, 803 P.2d 601).

The record reveals that on November 22, 1993, two days before the hearing, Bob filed supplemental answers to Cathy's first set of combined discovery requests. Interrogatory No. 26 instructed Bob to "[l]ist the items that you believe comprise the marital estate, assigning values to each item and stating the basis therefore in each case." Among the list of marital assets, Bob included the Recycle Technologies cash can investment and assigned a value of $30,000 to it. Bob also placed a value of $30,000 on the cash can investment on two other occasions: On May 17, 1993, in Attachment No. 5 to his answer to Cathy's first set of combined discovery requests; and on July 30, 1993, in his supplemental answers.

When Bob took the stand at the hearing, however, he testified that the value of the cash can was only $3000. He stated, "[w]e're not going to get [$]30,000 out of it so I would take it for $3,000 and try to chase it down, see if I couldn't work something out of it." Bob also called Dwayne Anderson, owner of Recycle Technologies, to testify to the value of the cash can investment. Anderson stated that, if the equipment were sold as scrap metal, its salvage value "could be $2500." However, Anderson stated that

7

this "would be a bad idea."  Furthermore, Anderson testified that, although no profit had been made from the venture, "being the eternal optimist, I would like to think there is prospect of [profit] at some point."  Prior to Anderson's testimony as to the value of the investment, Cathy's attorney objected, stating that "[i]f the intent of his testimony is to establish a value, [Bob is] precluded by his own admissions . . . in which he signed answers to interrogatories stating the value of this investment was $30,000."

In its findings of fact and conclusions of law, the District Court concluded that "Bob is judicially estopped from changing the valuation of [the cash can investment] some two days after filing his interrogatory with the Court," and placed a value of $30,000 on the cash can investment.  We agree.

"Under well established concepts of law, a party cannot take one position during pretrial discovery and then change his position at the time of trial or on appeal."  Montana Rail Link v. Byard (1993), 260 Mont. 331, 343, 860 P.2d 121, 128; Plouffe v. Burlington Northern, Inc. (1986), 224 Mont. 467, 474, 730 P.2d 1148, 1153.  Section 26-1-601(1), MCA, provides that the following is a conclusive presumption:

> [T]he truth of a declaration . . . of a party, as against that party in any litigation arising out of such declaration . . . whenever he has, by such declaration . . . intentionally led another to believe a particular thing true and to act upon such belief.

In Byard, this Court upheld the hearing examiner's decision to exclude testimony which Montana Rail Link (MRL) sought to introduce but which contradicted MRL's pretrial answers to Byard's

8

interrogatory requests. At no time prior to trial did MRL seek to modify its answer or indicate in any way that it would present contrary testimony. Likewise, at no time prior to trial in the instant case did Bob seek to modify the stated value of $30,000, nor did he indicate prior to trial that he would present testimony contrary to his pretrial position. Although the District Court, sitting without a jury, allowed Bob and Dwayne Anderson to testify contrary to Bob's pretrial answers, it correctly refused to consider that testimony in determining the cash can's value and correctly concluded that Bob was estopped from changing his position at trial.

<u>ISSUE 2</u>

Was the District Court's valuation of the marital assets clearly erroneous?

In addition to the valuation of the cash can investment, Bob attacks the District Court's valuation of AIC Properties at $81,000 and the Federal Reserve Thrift Plan at $90,344. Citing In re Marriage of Hall (1987), 228 Mont. 36, 740 P.2d 684, Bob asserts that the proper

> standard of review of distribution and valuation of marital property is that the Supreme Court will reverse a District Court only upon a showing that the District Court has acted arbitrarily or has committed a clear abuse of discretion, resulting in either instance in substantial injustice.

In 1992, however, this Court changed its standard of review regarding a district court's findings of fact in the division of marital estates from an abuse of discretion standard to a clearly

9

erroneous standard. In re Marriage of Sacry (1992), 253 Mont. 378, 381, 833 P.2d 1035, 1037; In re Marriage of Danelson (1992), 253 Mont. 310, 317, 833 P.2d 215, 219; In re Marriage of Taylor (1993), 257 Mont. 122, 125-26, 848 P.2d 478, 480. Therefore, we review the district court's findings of fact to determine whether those findings are clearly erroneous. Danelson, 833 P.2d at 219; Taylor, 848 P.2d at 480.

This Court has established several principles by which we review a district court's valuation of marital property. It is well settled law that "[w]hen there is a dispute over property in a marriage dissolution, the district court may assign any value that is within the range of values presented into evidence.*' Taylor, 848 P.2d at 481 (citing In re Marriage of Kramer (1987), 229 Mont. 476, 747 P.2d 865). "However, if the values are widely conflicting, then the district court must state its reasons for determining a certain value." Taylor, 848 P.2d at 481 (citing In re Marriage of Glass (1985), 215 Mont. 248, 697 P.2d 96).

Recycle Technologies Cash Can Investment

As discussed under Issue 1, the District Court properly estopped Bob from changing his position as to the value of the cash can investment at trial. In its findings of fact and conclusions of law, the District Court clearly set forth its reasons for rejecting Bob's proposed valuation of the cash can and for placing a value of $30,000 on it. We conclude that the District Court's valuation of the cash can investment was proper.

AIC Properties

Bob asserts that the District Court incorrectly valued AIC Properties at $81,000. He argues on appeal that, in arbitration proceedings between the McNellises and the Dagels, "an arms length value of $55,000.00 was arrived at as the value of the Dagel one-half interest . . ." and based on that "arms length" settlement, the McNellises' one-half interest for the purposes of marital property distribution is also $55,000. At trial, Bob also testified, after extensive calculations, that the McNellises' share was worth "between 38,500 and 54,000, 54,190, to be exact."

The District Court succinctly summarized the positions of the parties and made the following finding of fact:

> This partnership owns the building in which AIC, Inc., operates. . . . The building has been appraised at $334,300 . . . . Parts of the building are used by AIC in its industrial coating business, and other parts are leased out to other tenants. The rent paid by the tenants makes the mortgage payment due on the property.
>
> . . . .
>
> The parties owe $185,000 to the Small Business Administration on the building. Further . . . AIC Properties owes about $13,000 to Bob. Catherine feels that the AIC Properties Partnership should be valued at $81,000. This takes the appraised value of the building ($334,300) and subtracts from it the SBA loan of $185,000, the $13,000 owed to Bob, and the $55,000 owed to the Dagels. Bob, on the other hand, contends that AIC is worth on $55,000. He makes his calculations by taking the increase in value of the building over its book value, which totals $81,000. He then adds in the parties['] investment of $29,000 to come up with $110,000. Bob would then subtract the debt owed to the Dagels ($55,000), to come up with the $55,000 figure. The Court, however, finds that this approach ignores the market value of the building. Therefore, the Court values AIC Properties at $81,000.

We conclude that the District Court set forth sufficient reasons for adopting Cathy's valuation of AIC Properties, and therefore, the value of $81,000 is not clearly erroneous.

### Federal Reserve Thrift Plan and AIC Debt

Bob states that the District Court set aside all of the Thrift Plan to Cathy and valued it at $90,344. He contends that when the AIC loan is added back to the Thrift Plan, it will total $103,000, and therefore, the District Court incorrectly valued the Thrift Plan. The District Court distributed the Thrift Plan as follows:

> Pursuant to Petitioner's Exhibit 7, the current balance that the parties have in the thrift plan is $90,344. There is a $13,430 loan against this account that is being paid by AIC. The Court values the thrift plan at $90,344 and awards it to Catherine. The loan payments from AIC of $13,430 shall be Bob's.

If the remaining balance of the loan is added to the current balance of the Thrift Plan, the total would be $103,774; however, the District Court clearly severed the loan from the Thrift Plan, divided the total $103,744 into one unit of $90,344 and one unit of $13,430, and awarded these units respectively to Cathy and Bob. Bob's contention that the $13,430 debt that AIC owes the McNellises "is not an 'asset' and is in fact a liability which Bob must pay to himself" is entirely without merit. The debt is not personally owed by Bob; it is owed by AIC Properties, a separate legal entity. The District Court's award severs the loan from the Thrift Plan, and when AIC repays the loan, those payments will go to Bob, and not to Cathy. We conclude that the District Court's valuation of the Thrift Plan was proper.

12

## ISSUE 3

Was the District Court's distribution of the marital estate clearly erroneous?

"Our review of marital property divisions is whether the district court's findings of fact are clearly erroneous." In re Marriage of Nordberg (Mont. 1994), 877 P.2d 987, 991 St. Rep. 531; In re Marriage of Davies (Mont. 1994), 51 St. Rep. 929. "If substantial credible evidence supports the court's findings and judgment, this Court will uphold the district court's decision unless there is an abuse of discretion." Nordberg, 877 P.2d at 991. Substantial evidence is defined as "evidence that a reasonable mind might accept as adequate to support a conclusion: it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Davies, 51 St. Rep. at 932 (citing Barrettv. Asarco Inc. (1990), 245 Mont. 196, 200, 799 P.2d 1078, 1080).

Distribution of a marital estate is determined by the guidelines in § 40-4-202(1), MCA, which provides in part:

> In a proceeding for dissolution of marriage . . . the court, without regard to marital misconduct, shall . . . finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both.

It is a well-settled rule that an equitable distribution does not require a 50/50 distribution of the marital estate. Davies, 51 St. Rep. at 933; Nordberg, 877 P.2d at 992; In re Marriage of Bowman (1987), 226 Mont. 99, 734 P.2d 197.

13

Bob argues that the District Court "gave complete credence to Cathy's testimony regarding value of the Marital Estate and adopted her Proposed Findings of Facts and Conclusions." The record does not support this contention. The District Court rejected Cathy's proposed findings and conclusions regarding child support and ordered Bob to pay an amount substantially less than her request. The District Court also rejected Cathy's proposed valuation of the family residence. An examination of the findings and conclusions, reveals that the District Court carefully considered the evidence and testimony presented and made a reasoned valuation and distribution of each asset and liability. We conclude that the District Court's determinations are supported by substantial credible evidence and are not clearly erroneous.

Bob further argues that the District Court erroneously "set aside to Cathy nearly all of the assets having a hard cash value." This clearly is not the case, particularly with respect to Bob's award of the Federal Reserve Retirement Plan and AIC Properties. Moreover, while the District Court awarded Bob roughly 44 percent of the total assets of the marital estate, the District Court distributed to him only 16 percent of the total marital debt. We conclude that the District Court's distribution of the marital estate is not clearly erroneous.

Affirmed.

_____
Justice

14

We concur:

_____
Chief Justice

_____

_____
Justices

15

Justice Terry N. Trieweiler specially concurring.

I        with the majority's conclusions and reasoning in their discussion of Issues 2 and 3

I specially concur with the majority's holding under Issue 1, but disagree with the legal rationale for that holding.

I do not agree that Bob was precluded by judicial estoppel from offering testimony at trial which contradicted statements that he made prior to trial. I especially disagree that he was precluded from doing so by § 26-1-601(1), MCA, which I conclude is inapplicable to the facts of this case.

However, the basis for Bob's appeal from the District Court's valuation of his recycling machine investment is that there was no evidence to support the value arrived at by the District Court. I disagree.

Pursuant to Rule 801(d)(1)(A), M.R.Evid., prior inconsistent statements of a witness are admissible as substantive evidence. *See* Rule 801(d), Commission Comment. In this case, Bob's supplemental answer to Interrogatory No. 26, which was filed with the District Court prior to trial, was a prior statement inconsistent with his trial testimony and provided sufficient substantive evidence to support the District Court's finding that Bob's lease with Recycle