FILED

September 29 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0675

DA 14-0675

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 283

IN RE THE MARRIAGE OF:

JACKIE J. KOSTELNIK,

        Petitioner and Appellee,

  and

DANIEL J. KOSTELNIK,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DR 11-331B
Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Daniel J. Kostelnik, self-represented, Missoula, Montana

        For Appellee:

        Christopher J. Gillette, The Law Office of Christopher J. Gillette, PC,
Bozeman, Montana

Submitted on Briefs:  September 2, 2015
Decided:  September 29, 2015

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Daniel Kostelnik appeals the Order of the Eighteenth Judicial District Court, Gallatin County, adopting the Standing Master's findings of fact, conclusions of law, and final decree dissolving Daniel's marriage to Jackie Kostelnik. Daniel challenges the District Court's distribution of the marital estate. We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 Daniel and Jackie married in 1983 and have one adult child. They resided together in Belgrade, Montana, from 1986 until 2003. At the time of trial, Daniel was 49 years old and Jackie was 56. Daniel claims that the parties separated in March 2007, while Jackie claims that the parties essentially separated in 2003 when Daniel moved to Missoula for graduate school. Jackie filed a petition for legal separation in August 2011 and Daniel's answer requested the court to enter a decree of dissolution. The Standing Master held a two-day trial on October 30 and 31, 2012.

¶3 The evidence showed that Daniel worked at a sawmill in Belgrade beginning in 1985 and he earned over $30,000 a year from 1996-2003. After the mill closed in 2003, Daniel began work on a master's degree at the University of Montana in Missoula. A federal retraining program paid for his schooling and he was unemployed during this time. He completed his master's degree in 2010 after spending a short time at the marital home in Belgrade during 2006-2007. Daniel currently resides in Missoula and has been unable to find work in his field. He works as a handyman for an elderly woman but is not employed full time. Daniel was in good health at the time of trial.

¶4     Jackie was born with cerebral palsy and has a learning disability. Although she earned a college degree, she was a homemaker for the majority of the marriage. Jackie is ineligible for Social Security Disability benefits because she has not met the minimum work credit requirement—from 1989 through 2001 she reported $0 in taxed Social Security earnings, and the most she earned during the marriage was $6,973 in 1983. In the late 1980s, Jackie took a tainted dietary supplement which resulted in eosinophilia-myalgia syndrome ("EMS"), an incurable neurological condition. She has ongoing symptoms due to her EMS, including but not limited to: impairment of brain function, memory loss, aphasia, fatigue, and frequent falls. The frequency and intensity of the symptoms are unpredictable, making it difficult to determine Jackie's future medical costs.

¶5     Jackie and Daniel sued the tainted dietary supplement manufacturer in 1992. In 1995, the parties agreed to a structured settlement that amounted to $500,000 after attorney's fees. The only written evidence of how the settlement proceeds were disbursed is a settlement disbursement letter from the lawyer who represented the Kostelniks. Neither the settlement agreement nor the disbursal letter addressed the extent to which the settlement was meant to cover Jackie's medical care or compensate for loss of income or pain and suffering. The disbursement letter indicated that $297,584 was disbursed solely to Jackie and included a $10,000 consortium award to their then-minor son. The remaining $202,416 was disbursed in the form of the "Kostelnik Annuity" and included a $25,000 consortium award to Daniel.

¶6 The tax-free payments under the Kostelnik Annuity were structured as follows: $35,000 per year for five years from 2004-2008; $50,000 in September 2010; $75,000 in September 2015; $100,000 in September 2020; and $35,000 per year from 2021-2040. The payees of the annuity are listed as "Jackie and Daniel Kostelnik, or all to the survivor." At the time of trial, a total of $875,000 was to be disbursed from the annuity over 26 years.

¶7 After receiving the $297,584 lump sum settlement payment, Jackie placed $100,000 into a Certificate of Deposit ("CD") with First Security Bank under her name. At the time of trial, the First Security Bank CD had accrued $9,000 in interest. Jackie established a number of other CDs, none of which had funds remaining for distribution at the time of trial. Jackie used the remainder of the lump sum settlement payment to pay outstanding bills, pay living expenses, make home improvements, tithe to religious and educational organizations and individuals, purchase a van for her transportation, and pay off the mortgage on the marital home.

¶8 Besides the settlement proceeds, the parties' principal marital asset was a home in Belgrade that they purchased in 1986. The home was financed through the Federal Housing Authority and the parties paid a subsidized monthly mortgage during the marriage. Jackie paid off the mortgage balance of $53,952.80 in February 1995 with the settlement proceeds. She lived in the home at the time of trial. Daniel maintained the home and landscaping during the marriage and also made improvements to the home. His employment income alone kept the mortgage current until 1995. At trial, the parties stipulated to an appraised value of $100,000 for the home.

4

¶9 The structured payments from the annuity began in 2004 and were issued in both parties' names and initially deposited into the parties' joint checking account. The Standing Master found that Daniel received his $25,000 consortium award from the first annuity payment. Jackie kept subsequent annuity payments in a separate account. At the time of trial, all of the annuity payments from 2004-2008 had been spent and were not available for distribution.

¶10 The parties produced a number of other financial disclosures at trial. Daniel accrued over $160,000 in various retirement accounts during the marriage. He also had 206 shares of Louisiana-Pacific stock valued at $1,973 at the time of trial. The parties owned four vehicles; each was valued under $3,000 and all but one were titled solely in Daniel's name. Jackie listed furniture and electronics valued at $1,000 and Daniel listed firearms and tools valued at approximately $5,000 and $2,000, respectively. Finally, Daniel disclosed nearly $30,000 in outstanding debt, while Jackie did not list any outstanding debts.

¶11 After reviewing both parties' circumstances, the Standing Master apportioned the marital estate in a detailed 29-page Report with findings of fact, conclusions of law, and a Decree of Dissolution. The Standing Master concluded that the total value of the parties' personal property, vehicles, retirement accounts, stock, and marital home was $328,755. The Standing Master determined that these assets were accumulated jointly during the marriage and should be equitably apportioned. The Standing Master awarded assets to Daniel with a total value of $225,501; therefore, the Report ordered him to pay Jackie an

equalization amount of $61,123. The Standing Master awarded the marital home to Jackie, ordering that Daniel was entitled to an equal share of the home's value.

¶12     The Standing Master concluded that the remaining settlement proceeds—including the First Security Bank CD—should be awarded solely to Jackie. In awarding the settlement proceeds to Jackie, the Standing Master determined that Daniel was underemployed but able to work, while Jackie would incur ongoing medical expenses and was unable to maintain employment. Moreover, the Standing Master considered the allocation of the settlement proceeds as an alternative to awarding Jackie spousal maintenance. The Standing Master determined that it was Jackie's personal injury claim that resulted in the vast majority of the settlement proceeds and that the parties did not treat the proceeds as joint assets. The remaining settlement proceeds' total value amounted to $984,000.

¶13     The Standing Master concluded that each party should be responsible for any debts incurred in their name since March 2007. Finally, the Standing Master denied Daniel's request for spousal maintenance and denied both parties' request for attorney's fees.

¶14     Daniel filed objections to the Standing Master's Report. In August 2014, the District Court held a hearing considering Daniel's objections. The court did not consider any additional evidence at the hearing. The court concluded in a September 2014 order that the Standing Master's Report was not clearly erroneous and therefore affirmed and adopted the Report in its entirety. Daniel appeals.

**STANDARDS OF REVIEW**

¶15   Two standards of review are relevant in cases involving both a standing master and the district court: the standard the district court applies to the master's report and the standard we apply to the district court's decision. *In re Parenting of G.J.A.*, 2014 MT 215, ¶ 11, 376 Mont. 212, 331 P.3d 835.   This Court reviews a district court's decisions de novo to determine whether it applied the correct standard of review to a standing master's findings of fact and conclusions of law. *In re Marriage of Patton*, 2015 MT 7, ¶ 17, 378 Mont. 22, 340 P.3d 1242.  A district court reviews a standing master's findings of fact for clear error, *Patton*, ¶ 24, and its conclusions of law to determine if they are correct, *Patton*, ¶ 43.

¶16   We review a district court's marital property division to determine whether the findings of fact on which the distribution is based are clearly erroneous. *Patton*, ¶ 18.  A finding is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake.  *Patton*, ¶ 18. We review a district court's conclusions of law to determine if they are correct.  *Patton*, ¶ 18.   Absent clearly erroneous findings, we will affirm a district court's property division unless we identify an abuse of discretion. *In re Marriage of Funk*, 2012 MT 14, ¶ 6, 363 Mont. 352, 270 P.3d 39.

**DISCUSSION**

¶17   On appeal, Daniel argues that the apportionment of the remaining settlement proceeds—the bulk of the marital estate—to Jackie was not fair and equitable.

7

¶18 Section 40-4-202, MCA, governs marital estate distribution. It requires the court to "equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title to the property and assets is in the name of the husband or wife or both." Section 40-4-202(1), MCA. That is, "*everything* owned jointly or by either party must be equitably apportioned . . . regardless of when or how it was acquired." *Funk*, ¶ 13 (emphasis in original). In equitably apportioning the marital estate, the court must consider the following factors:

> [T]he duration of the marriage and prior marriage of either party, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties, custodial provisions, whether the apportionment is in lieu of or in addition to maintenance, and the opportunity of each for future acquisition of capital assets and income.

Section 40-4-202(1), MCA. It is well-settled that an equitable apportionment "does not require a 50/50 distribution of the marital estate." *In re Marriage of McNellis*, 267 Mont. 492, 501, 885 P.2d 412, 418 (1994). As such, § 40-4-202, MCA, "vests a trial court with far-reaching discretion to fashion a fair distribution of the marital property using reasonable judgment and relying on common sense." *In re Marriage of Harper*, 1999 MT 321, ¶ 36, 297 Mont. 290, 994 P.2d 1 (internal quotations and citations omitted).

¶19 Daniel first argues that both he and Jackie were parties to the settlement and that the Kostelnik Annuity proceeds are the result of investments they purchased and held jointly for their needs. Daniel contends that the Standing Master therefore erred by not apportioning some of the settlement proceeds to him. Daniel next claims that the Standing Master inconsistently analyzed and applied the source of the various assets in

8

apportioning them. He argues that if *Funk* applies, all of the parties' assets—including the settlement funds—are subject to equitable apportionment regardless of the source. Conversely, he argues, if the source of funds controls, then all of the retirement accounts and half of the bank accounts and house should have been apportioned to him. Daniel further argues that Jackie is capable of finding employment and that the Standing Master did not sufficiently consider the evidence concerning Daniel's employment circumstances.

¶20 As the Standing Master's Report notes, under *Funk* and § 40-4-202, MCA, the source of the property or assets does not affect their equitable apportionment. The Standing Master made factual findings from which she determined how the settlement proceeds and the Kostelnik Annuity should be distributed. Although the Standing Master concluded that the settlement proceeds were not treated as a joint asset by the parties, our review of the record indicates that the Standing Master did not ground her apportionment on this conclusion. Rather, the Standing Master concluded that it was fair and equitable to award Jackie all remaining proceeds.

¶21 The Standing Master made detailed factual findings on both parties' financial, employment, and medical circumstances. Based upon these findings, the Standing Master concluded that Daniel was more educated than Jackie and had "a greater history of gainful and higher income employment." Moreover, the Standing Master determined that Jackie's substantial health issues limited her employment opportunities and required "approximately $700-900 per month" in medical expenses. The Standing Master determined that if the proceeds were divided as proposed by Daniel, then Jackie "would

9

not have sufficient property to provide for her reasonable needs and would not be able to be self-supporting through appropriate employment."

¶22 As the District Court observed, the record shows that the Standing Master gave due consideration to both parties' testimony regarding employment potential and wrote thorough factual findings supporting the ultimate marital estate apportionment. Moreover, contrary to Daniel's argument, equitable apportionment does not require an equal distribution of the marital estate. *McNellis*, 267 Mont. at 501, 885 P.2d at 418. The Standing Master did award Daniel an equal interest in the marital home and observed that he still is the beneficiary on the Kostelnik Annuity should he survive Jackie.

¶23 The record shows that the Standing Master used reasonable judgment in fashioning a fair distribution of the marital estate. Our own review of the record convinces us that the Standing Master's findings are supported by substantial evidence and that the Standing Master did not misapprehend the effect of the evidence. We conclude that the District Court appropriately reviewed the entire record and correctly applied the relevant standard of review to the Standing Master's findings of fact and conclusions of law.

## CONCLUSION

¶24 The District Court did not err in reviewing and adopting the Standing Master's marital estate division. Accordingly, we affirm.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ PATRICIA COTTER
/S/ JAMES JEREMIAH SHEA