FILED

11/19/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0632

DA 23-0632

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 273

IN RE THE MARRIAGE OF:

DAVID RODMAN ASH,

  Petitioner and Appellant,

 and

BREE ELLIOT (f/k/a BRENDA MARIE ASH),

  Respondent and Appellee.

APPEAL FROM: District Court of the Eleventh Judicial District,
       In and For the County of Flathead, Cause No. DR-15-2002-556
       Honorable Danni Coffman, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

     Matthew T. Cochenour, Cochenour Law Office, PLLC, Helena, Montana

     P. Mars Scott, Attorney at Law, Missoula, Montana

   For Appellee:

     Penni L. Chisholm, Chisholm & Chisholm, P.C., Columbia Falls, Montana

          Submitted on Briefs: August 21, 2024

             Decided: November 19, 2024

Filed:

         _____
               Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 In September 2022, David Rodman Ash (Ash) petitioned to dissolve his marriage with Bree Elliot (Elliot). On July 13, 2023, the Eleventh Judicial District Court, Flathead County, issued its Findings of Fact, Conclusions of Law, and Decree of Dissolution, dissolving the marriage and dividing the marital property. Ash moved to amend the decree, arguing that the District Court had disregarded his labor contributions constructing a shared home when the court distributed the marital assets, as well as his poor health and limited prospects of future income. The District Court denied his motion to amend on October 2, 2023. Ash now appeals the District Court's allocation of the marital assets. We reverse and remand.

¶2 We restate the following issue on appeal:

*Whether the District Court equitably apportioned the marital estate.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 Ash and Elliot married on July 1, 2015. They separated on June 15, 2022, and their divorce was finalized on July 13, 2023. The seven-year union was the second marriage for both, and each had two adult children from previous relationships. At the time of dissolution, Ash was 65 years of age and Elliot was 62 years of age.

¶4 Elliot retired in 2015 from a career in the captive insurance market. She had a premarital net worth of $3,616,000. Most of her assets were held in a personal trust, except for her retirement accounts, vehicles, and the home she shared with Ash.

¶5 Ash is self-employed in the land management and property caretaking field. Ash also has expertise in designing and building custom log homes and furniture. Since 1997,

Ash has lived on a five-acre property on Eastman Drive (Eastman Property). He saved $16,386 for a down payment on the property and purchased it for $144,900 in 1998. He raised two daughters as a single parent in the home and one daughter and her son still live on the property.

¶6 Ash intended to live on the Eastman Property for the rest of his life. When Ash and Elliot married, Elliot paid off the remaining $99,082 mortgage balance on the property. Ash and Elliot then established the Ash Residence Trust. Under the governing terms, Ash transferred his Eastman Property into the trust and Elliot would "substantially invest in improvements" to the property. The trust agreement stipulated that each spouse owned a 50% interest in the property and that each "had provided and will continue to provide equal contributions" to improving the Eastman property, either financially or through nonmonetary contributions. While the trust agreement contemplated the rights of Ash or Elliot should one survive the other, the trust did not contain any provisions for distribution of property in the event of the dissolution of their marriage.

¶7 The couple then began constructing a 6,000 square foot house (the Lodge) on the Eastman Property. Elliot and Ash cooperated on the designs of the Lodge. Ash oversaw construction of the home, using his expertise as a contractor and log home designer. He supervised or did much of the actual labor himself. Ash devoted more time to building the Lodge, and less to his paying-customer base.

¶8 For the first three years of the marriage, Elliot continued to reside at her nearby premarital property (Parker Lakes Property). Elliot moved into the Eastman Property in

3

2018 and sold the Parker Lakes Property in 2020. Ash testified he performed year-round maintenance of the Parker Lakes Property for Elliot. In Winter 2019, the Parker Lakes Property pipes froze and burst, causing flooding of the basement and other damage. Elliot hired a restoration company to dry the basement, but Ash testified he performed the actual repairs and necessary rehabilitation of the house with his employees and subcontractors. The employees and subcontractors were paid, but Ash was not. Ash also prepared the Parker Lakes Property for sale. Ash estimated his contributions to the Parker Lakes Property amounted to $55,000-$57,000. When Elliot sold the property in 2020 for $850,000, Ash received no compensation for his labor. Elliot reasoned that because she had planned to provide for the rest of their lives, Ash need not worry about immediate compensation. Elliot likewise encouraged Ash to begin receiving his Social Security at his earliest eligible age, even though he would be receiving a reduced benefit.

¶9     By the time of dissolution, the Lodge was largely finished but not completed. The remodel, in terms of hired labor and construction material, cost approximately $1,050,918. The costs were paid from the Ash Resident Trust's joint construction account largely funded by Elliot.

¶10    Both parties have struggled with their health in recent years. Elliot has a history of stroke. A lifetime of manual labor has taken its toll on Ash, who now has artificial knees and ankles. Elliot no longer needs to work as she can live off her various investments and retirement accounts. However, Ash believes he will need to work for the rest of his life.

4

¶11 The parties stipulated to much of the distribution of the marital estate, including premarital assets, personal property, and vehicles. Following a one-day bench trial on June 8, 2023, the District Court issued its Findings of Fact, Conclusions of Law, and Decree of Dissolution on July 13, 2023, awarding 80% of the value of the Eastman Property to Elliot and 20% to Ash. The order provided Ash had 30 days to buy out Elliot's interest and, if he was unable to secure financing, Elliot then had the same opportunity to buy out Ash's interest. Ash moved to amend the decree, arguing the distribution of the Eastman Propery was inequitable. The court denied this motion on October 2, 2023. Ash then appealed to this Court.

**STANDARD OF REVIEW**

¶12 We review a district court's division of marital property to determine whether the court's findings of fact are clearly erroneous. *In re Marriage of Funk*, 2012 MT 14, ¶ 6, 363 Mont. 352, 270 P.3d 39; *In re Marriage of Tummarello*, 2012 MT 18, ¶ 21, 363 Mont. 387, 270 P.3d 28. A finding of fact is clearly erroneous if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or our review of the record convinces us that the district court made a mistake. *In re Tummarello*, ¶ 21 (citation omitted). Absent clearly erroneous findings, we will affirm a trial court's apportionment of the marital estate unless we identify an abuse of discretion. *In re Funk*, ¶ 6; *In re Tummarello*, ¶ 21; *Richards v. Trusler*, 2015 MT 314, ¶ 12, 381 Mont. 357, 360 P.3d 1126. An abuse of discretion occurs if the court acted arbitrarily without employment of

5

conscientious judgment or exceeded the bounds of reason resulting in a substantial injustice. *In re Tummarello*, ¶ 21 (quotation omitted).

## DISCUSSION

¶13 Pursuant to § 40-4-202(1), MCA, a court's findings of fact must allow for a reviewing court to determine the reasonableness of the court's apportionment without having to speculate as to the appropriate net worth of the marital estate. *In re Marriage of Crowley*, 2014 MT 42, ¶¶ 26, 32, 374 Mont. 48, 318 P.3d 1031 (citations omitted); *In re Funk*, ¶ 34. "While § 40-4-202, MCA, does not require a strict, itemized accounting and valuation of every marital asset and liability in every case, district courts must at least make findings of fact that are sufficient as a whole to manifest an equitable distribution of the marital estate." *In re Marriage of Elder and Mahlum*, 2020 MT 91, ¶ 9, 399 Mont. 532, 462 P.3d 209 (citations omitted); *see also In re Marriage of Richards*, 2014 MT 213, ¶ 15, 376 Mont. 188, 330 P.3d 1193 (quoting *In re Marriage of Lewton*, 2012 MT 114, ¶ 15, 365 Mont. 152, 281 P.3d 181); *Larson v. Larson*, 200 Mont. 134, 139, 649 P.2d 1351, 1354 (1982) ("Item-by-item findings are not required in property division cases, but findings nevertheless must be sufficiently adequate to ensure that this Court need not succumb to speculation while assessing the conscientiousness or reasonableness of the District Court's judgment." (citation omitted)). Relevant here, "[p]arties are bound by stipulations made in open court." *In re Marriage of Jakkola*, 267 Mont. 450, 453, 884 P.2d 783, 785 (1994) (citation omitted). When "the court is able to apply the statutory [§ 44-4-202, MCA] criteria, while, at the same time, holding the parties to their on-record stipulations and

agreements, it should do so." *In re Jakkola*, 267 Mont. at 453, 884 P.2d at 785 (quotation omitted).

¶14    Here, the record indicates that the parties had stipulated how to allocate much of the marital estate, agreeing to the distribution of their personal property as well as most of the premarital assets, including vehicles. Through these stipulations, Ash sought none of the money Elliot held in her personal trust or retirement investments. Instead, he argues the District Court erred by not calculating the full net worth of the marital estate. This finding need not be "a specific finding of the marital estate's net worth," however the court must provide sufficient evidence from which we can ascertain the reasonableness of the ultimate apportionment. *In re Crowley*, ¶ 34. We conclude there was no error in the valuation of the marital estate. This dispute primarily concerns the apportionment of the Eastman Property, not the other assets distributed pursuant to the stipulation of the parties. The District Court made a specific finding of the worth of this primary asset in dispute and from that we can review the equitableness of the distribution of that asset.

¶15    "The distribution of marital property in a dissolution proceeding is governed by § 40-4-202, MCA, under which a trial court is vested with broad discretion to distribute the marital property in a manner that is equitable to both parties." *Richards*, ¶ 11 (citing *In re Marriage of Lee*, 282 Mont. 410, 421, 938 P.2d 650, 657 (1997)). The factors § 40-4-202(1), MCA, mandates a district court to consider are:

> the duration of the marriage and prior marriage of either party, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties, custodial provisions, whether the apportionment is in lieu of or in addition to

7

maintenance, and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution or dissipation of value of the respective estates and the contribution of a spouse as a homemaker or to the family unit. In dividing property acquired prior to the marriage, property acquired by gift, bequest, devise, or descent, property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise, or descent, the increased value of property acquired prior to marriage, and property acquired by a spouse after a decree of legal separation, the court shall consider the contributions of the other spouse to the marriage, including:

(a) the nonmonetary contributions of a homemaker;
(b) the extent to which such contributions have facilitated the maintenance of the property; and
(c) whether or not the property division serves as an alternative to maintenance arrangements.

After a court considers these factors, the statute further directs the district court to "finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title to the property and assets is in the name" of one spouse, the other, or both. Section 40-4-202(1), MCA. "Section 40-4-202, MCA, vests the district court with broad discretion to equitably apportion the marital estate in a manner equitable to each party according to the circumstances of each case." *In re Marriage of George and Frank*, 2022 MT 179, ¶ 35, 410 Mont. 73, 517 P.3d 188 (citing *In re Funk*, ¶¶ 16, 19). When dividing marital property, the trial court must reach an equitable distribution, not necessarily an equal distribution. *Richards*, ¶ 11 (citing *In re Marriage of Walls*, 278 Mont. 413, 416, 925 P.2d 483, 485 (1996); *In re Marriage of Kostelnik*, 2015 MT 283, ¶ 18, 381 Mont. 182, 357 P.3d 912).

¶16     In *Richards*, we reversed a district court's apportionment which provided only 6% to 10% of the marital estate to one spouse because the district court, despite appropriately

8

taking into account the spouse's various nonmonetary contributions to the marriage, "unduly minimized" those nonmonetary contributions. *Richards*, ¶ 31. There, the apportionment granted by the district court did not provide the wife with "sufficient property to provide for her reasonable needs." *Richards*, ¶ 31. As in *Richards*, we have "often considered the effect of the nonmonetary contributions" of a spouse to the marital estate. *In re Marriage of Davies*, 266 Mont. 466, 474, 880 P.2d 1368, 1374 (1994). We have affirmed an apportionment compensating a spouse for nonmonetary contributions to the marital estate, agreeing with the district court that the evidence of the spouse's nonmonetary contributions painting and remodeling properties supported an apportionment of half of the appreciation in value of marital property. *In re Marriage of Maedje*, 263 Mont. 262, 268-69, 868 P.2d 580, 584 (1994). We have also affirmed an apportionment to a spouse for years of nonmonetary contributions rendered to the family ranch, finding that this uncompensated labor enabled the husband to pursue other endeavors unencumbered by domestic responsibilities. *In re Marriage of Glass*, 215 Mont. 248, 257, 697 P.2d 96, 101-02 (1985). In *Jacobson*, we affirmed an apportionment of half of the value of the marital estate as equitable considering the spouse's nonmonetary contributions in the form of domestic ranch labor. *In re Marriage of Jacobson*, 183 Mont. 517, 522, 600 P.2d 1183, 1186 (1979). In *Tummarello*, we affirmed an apportionment based upon a spouse's significant contributions to the marriage for "performing interior and exterior projects" to maintain the premarital property of the other spouse. *In re Tummarello*, ¶ 26. Likewise, this Court affirmed an apportionment of one half of the value

9

of property when it was "undisputed that a large portion of the increase in value was directly attributable" to the nonmonetary, sweat equity contributions of the nonacquiring spouse. *In re Marriage of Clark*, 2003 MT 168, ¶ 20, 316 Mont. 327, 71 P.3d 1228.

¶17 We have similarly reversed district courts for failing to equitably consider when one spouse primarily made nonmonetary contributions to the accrued marital property. In *Larson*, we reversed a district court excluding the nonmonetary contributions of a spouse to the appreciation in value of the other spouse's premarital property. *Larson*, 200 Mont. at 141-42, 649 P.2d at 1354-55 (1982). And in *Miller*, we reversed for clear error a finding that a spouse's nonmonetary contributions were "negligible" when evidence showed she had made significant nonmonetary contributions to the marital estate. *In re Marriage of Miller*, 238 Mont 197, 200, 777 P.2d 319, 321-22 (1989).

¶18 Thus, our precedent has recognized the value of nonmonetary contributions in the form of "domestic labor" when dividing the marital estate in a dissolution. This labor goes not just to the property of the marital estate, but the "*marriage*" itself. *In re Tummarello*, ¶ 26 (citing §§ 40-4-202(1), -202(1)(b), MCA) (emphasis added in original). That such labor proves difficult if not entirely intangible when quantifying for tax or record keeping purposes—as is the case here with Ash's inconsistent and often cash-based business practices—does not negate the District Court's obligation to consider these nonmonetary contributions under § 40-4-202(1), MCA.

¶19 Here, our review of the record indicates the District Court abused its discretion by diminishing the value of Ash's nonmonetary contributions to the maintenance of the

10

martial assets in direct contradiction of several findings of fact regarding his nonmonetary contributions to the marital estate. At the time of the dissolution, an appraiser valued the Eastman Property at $1,450,000. The District Court determined Elliot's investment in the property totaled $1,150,000, comprised of her satisfaction of the outstanding mortgage balance of $99,082 and the $1,050,918 she invested in construction costs to build the Lodge. The District Court found the property was worth $400,000 at the time of the marriage. Ash's interest in the Eastman Property was valued at that amount plus $24,467 for his documented cash contributions towards construction costs, minus Elliot's mortgage pay-off—a final sum of $325,385. Meanwhile, photographic evidence and testimony at trial from Ash, an employee, Ash's daughter, and even Elliot herself established the various responsibilities assumed by Ash during the construction of the Lodge. The labor performed by Ash was no less "domestic" than the nonmonetary contributions we have recognized were made by other spouses to the marriage and marital estate. The District Court arbitrarily diminished the role Ash's labor contributed to the value of both the Eastman Property and Parker Lakes Property, citing Ash's lack of recordkeeping. Using his skills as a contractor to maintain the couple's homes, Ash contributed significantly to the marriage, as evidenced by the testimony and exhibits at trial; yet the dissolution decree provides him with only 20% of the Eastman Property. Because Ash devoted more time to work on the properties owned by the parties, he devoted less time to his businesses, which might have afforded him a wider customer base or otherwise provided for his retirement. By forgoing those individual business opportunities and instead focusing his time and

11

efforts on the Lodge, Ash conferred a benefit on the marital estate which the District Court failed to appropriately measure in the marital distribution. While the terms of the Ash Property Trust do not control the ultimate distribution of the property, the governing document reveals both parties' intentions to value each other's contributions to the Lodge more equally than the ultimate distribution decreed by the District Court. Without the very real labor performed by Ash in building and designing the Lodge or supervising the subcontractors, the Eastman Property would be worth much less than what the appraisal reflects.

¶20 The District Court faulted Ash for his inability to keep records of his finances to better support his claims for nonmonetary contributions. Not only do we disagree with such a requirement, but the record also indicates that Ash relied on Elliot's financial literacy. She filed the couple's joint tax returns during the marriage, taking advantage of the cash-based nature of Ash's work to limit her own financial exposure and to qualify the couple for federally subsidized health insurance. As a sophisticated financier, Elliot was able to capitalize on the informal nature of Ash's records to her own benefit, too. Ash also began withdrawing his Social Security benefit at his earliest eligibility at Elliot's encouragement. Ash made this decision in part to enable the couple to maximize the benefit of Elliot's various retirement accounts and minimize her tax or penalty exposure for earlier withdrawal. This decision resulted in Ash receiving $639 per month in Social Security. Had he waited until the age of 70, he would have been eligible to receive a benefit of approximately $1,400 per month. Elliot did gift Ash a retirement account worth $6,500,

but the record is replete with evidence of Ash's reliance on Elliot for financial stability and guidance. Elliot relied on Ash's experience and expertise in property maintenance and construction for the preservation of her Parker Lakes Property and in building the Lodge, yet the District Court failed to consider his nonmonetary contributions when dividing the estate.

¶21 The District Court further abused its discretion by seeking to return the parties to their premarital positions. In Finding of Fact 51, the District Court determined, "given the short duration of the marriage," the "fair and equitable" allocation of the Eastman Property was to "award each party his or her financial investment/equity." Likewise, Conclusion of Law 11 states that the "division of the marital estate is fair and equitable as it seeks to return the parties to approximately their premarital status." However, "the court is not bound to restore the parties to their premarital status." *In re Marriage of Shirilla*, 225 Mont. 106, 109, 732 P.2d 397, 399 (1987) (citation omitted). There, as in the instant case, one spouse brought significantly more assets to the marriage than the other and sought the return of that value upon dissolution, but we rejected this argument because the law clearly requires equitable apportionment and not a strict accounting of the parties' relative financial investments in the marriage. *In re Shirilla*, 225 Mont. at 109, 732 P.2d at 399. Premarital status is not a factor under § 40-4-202(1), MCA, and while those factors "are not limitations on the court's obligation and authority to equitably apportion all assets and property," *In re Funk*, ¶ 19, the District Court here abused its discretion by ascribing more

value to the parties' premarital economic stations than Ash's nonmonetary contributions to the estate.

## CONCLUSION

¶22    The District Court abused its discretion by failing to consider Ash's nonmonetary contributions to the marriage in the form of maintenance and construction of the parties' properties.  We reverse the distribution of the marital assets and remand to the District Court for further proceedings consistent with this opinion.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON