No. 93-205

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

IN RE THE MARRIAGE OF

MARK D. DAVIES,

          Petitioner and Respondent,

     and

MARGARET M. DAVIES,

          Respondent and Appellant.

**FILED**

SEP 21 1994

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Seventeenth Judicial
               District, In and for the County of Blaine,
               The Honorable Leonard Langen, Judge presiding.


COUNSEL OF RECORD:

          For Appellant:

               Robert F. James, James, Gray & McCafferty,
               Great Falls, Montana

          For Respondent:

               Mort Goldstein, Goldstein Law Firm,
               Havre, Montana

          For Amicus Curiae:

               Jody McCormick and Cynthia Ford, Women's Law
               Caucus, University of Montana School of Law,
               Missoula, Montana


                         Submitted on Briefs:   April 28, 1994

                                   Decided:   September 21, 1994

Filed:

_____
               Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Appellant Margaret M. Davies appeals from a final judgment and decree entered April 2, 1993, in the Seventeenth Judicial District, Blaine County, dissolving her marriage to Mark D. Davies and dividing the marital estate.

We affirm in part, reverse in part, and remand to the District Court for further proceedings in accordance with this opinion.

Margaret raises the following issues:

1. Did the District Court err in dividing the marital estate, including the refusal to award Margaret a portion of the cash value of Mark's stock in two closely held family corporations?

2. Did the District Court err in discounting the values of stock in the closely held corporations?

3. Did the District Court err in its award of maintenance?

4. Did the District Court err in allowing Mark to call a vocational expert?

5. Did the District Court err in refusing to admit Exhibit DDD?

6. Did the District Court err in awarding Margaret her attorney fees without holding a separate hearing after the trial?

Margaret Davies and Mark Davies were married on June 26, 1970. There were two children born of the marriage, Jeni, age 21, and Ian, age 18. Both parties graduated from Montana State University in 1970. Mark received a degree in Agricultural Business and Margaret received a degree in Fine Arts. Following graduation, the

2

parties married and moved to Mark's family ranching operation near Chinook.

The Davies ranching operation consists of two separate ranches, the Davies Ranch Company and the S BAR B Ranch. The Davies Ranch was acquired in 1950, and title was placed in the Davies Ranch Company, a Montana corporation incorporated on January 2, 1950. On January 10, 1950, the stockholders entered into a restrictive stock agreement which provided that there could be no transfer of stock except to other members of the Davies family. Counsel for the parties stipulated that the net value of the Davies Ranch is $1,530,150.

As of the date of the filing of the petition for divorce in 1991, there were 435 outstanding shares of Davies Ranch Corporation stock which were distributed as follows:

| | |
|---|---|
| Joyce Y. Davies (Mark's mother) | 184 |
| Joyce Y. Davies for life with remainder to her four sons | 115 |
| Jack W. Davies | 41 |
| Mark D. Davies | 25 |
| Dan K. Davies | 27 |
| Mark D. Davies, as trustee for the benefit of Jeni and Ian | 16 |

Mark's 25 shares were received by gift or inheritance during his marriage to Margaret. The court valued the stock at $3518 per share by dividing the net worth of the Davies Ranch ($1,530,150) by 435 outstanding shares. Using the formula set forth in the restrictive stock agreement, the court discounted the book value by 50 percent, resulting in a current value of $1759 per share. The court set the current value of Mark's shares at $43,975.

3

The S BAR B Ranch was acquired by the Davies family in 1963. It was incorporated as a Montana corporation on March 8, 1963. On March 9, 1963, the shareholders entered into a restrictive stock agreement restricting the sale or transfer of corporation stock to anyone outside of the immediate Davies family. Counsel for the parties stipulated that the net worth of the S BAR B Ranch is $4,104,532. As of the date of the filing of petition for divorce, there were 2024 outstanding shares of S BAR B Ranch stock which were distributed as follows:

| | |
|---|---|
| Jack W. Davies | 346.2 |
| Mark D. Davies | 346.2 |
| Rick D. Davies | 316.2 |
| Dan K. Davies | 326.2 |
| Joyce K. Davies | 131.2 |
| Joyce K. Davies life estate remainder to her sons | 548 |

The court valued the stock at $2028 per share by dividing the net value of the S BAR B Ranch ($4,104,532) by the 2024 outstanding shares. Applying the formula set forth in the restrictive stock agreement, the court discounted the book value by 50 percent for a current value of $1014 per share. Of Mark's 346.2 shares of S BAR B Ranch stock, 318.2 were acquired by gift or inheritance, and 18 were acquired by purchase. The court set the current value of Mark's shares at $332,795.

Mark is the president and general manager of the Davies Ranch Company and vice president of the S BAR B Ranch Company. He has written employment agreements which grant him broad powers to make purchases of machinery and livestock, to spend money for repairs, and to buy and sell cattle.

4

The parties separated in April 1990. On May 16, 1990, Mark filed a petition for dissolution. With each party represented by counsel, the matter was heard by the court. On April 2, 1993, the court entered its judgment and "Findings of Fact, Conclusions of Law, and Decree of Divorce." The decree provides as follows:

(1) Include a provision for making payments previously set forth in these findings.

(2) Provide for maintenance to be paid to [Margaret] as follows:
(a) $2200 per month for thirty months beginning April 1, 1993.
(b) $1800 per month for thirty months beginning April 1, 1995.
(c) $1400 per month for thirty months beginning March 1, 1998.

(3) [Margaret] is now included on Mark's health insurance policy. Mark shall keep her on that policy as long as possible, and shall make arrangements for equal health coverage on another policy for her when the present one expires, so far as she is concerned. Mark shall pay the premiums therefor, so that she has health insurance coverage for a period up to at least April 1, 1995.

(4) I have recommended in my Findings that [Margaret] should obtain a complete medical examination, a complete physical and mental examination. If she elects to do this, Mark shall pay the cost of this additional treatment not covered by insurance, up to $3500.

(5) If the examination recommends further treatment or counseling, Mark shall pay the cost of this additional treatment, not covered by insurance up to $2500.

(6) I have recommended that following the physical and mental examinations and treatment, that Margaret should submit to an examination by a qualified career guidance person to suggest the career to which she is most likely to achieve success. Mark shall cover up to $500 of the cost of this..

(7) If it is recommended by the guidance counselor that Margaret shall enroll in some qualified school so that she can receive the training necessary to qualify her for

the employment, Mark shall pay up to $1500 of such training.

## ISSUE 1

Did the District Court err in dividing the marital estate, including the refusal to award Margaret a portion of the cash value of Mark's stock in the closely held family corporations?

We note that the record discloses minor errors in the figures submitted by Mark and incorporated in the findings of fact and conclusions of law, and we remand for correction of these errors.

In **distributing** the marital estate, the court relied primarily on the proposed findings of fact and division of marital assets submitted by Mark. The court divided the marital assets into Categories A, B, C, and D. With the exception of some miscellaneous items listed in Category A, the assets listed in Categories A, B, and C are shares of stock in either the Davies Ranch Company or the S BAR B Ranch Company. The value of the stock as listed has been discounted 50 percent.

Category A lists property Mark owned before the marriage. Included in Category A are miscellaneous items valued at $1000 and 171 shares of stock in the S BAR B Ranch Company valued at $181,089.

Category B lists property gifted to or inherited by Mark during the marriage. Included in Category B are 25 shares of Davies Ranch Company stock valued at $44,750, 157.2 shares of S BAR B Ranch stock valued at $166,471, and 6 shares of Davies Ranch Company stock held by Mark for his children valued at $21,199.

6

Category C lists speculative or contingency value property gifted to or inherited by Mark during the marriage. Mark has a contingency interest as one of four designated beneficiaries in a living trust made by his mother which is revocable at any time during her lifetime. Mark's contingency interest in the trust is funded with shares of Davies Ranch Company stock valued at $101,000. Mark's mother received a life estate through the estate distribution of her late husband. Her husband's estate provided that at her death, the four sons would receive in **equal** shares Davies Ranch Company and S BAR B Ranch Company stock. The court valued Mark's share at $106,483.

Category D consists of property acquired and debts accrued during the marriage by mutual effort. Margaret does not dispute the distribution of the Category D assets.

The total pre-tax value of the assets listed in Categories A, B, and C is $631,936. Of this amount, the court distributed $631,936 to Mark. Margaret attacks the court's distribution of these assets.

"Our review of marital property divisions is whether the district court's findings of fact are clearly erroneous." In re Marriage of Nordberg (Mont. 1994), 877 P.2d 987, 991, 51 St. Rep. 531, 535; In re Marriage of Maedje (Mont. 1994), 868 P.2d 580, 583, 51 St. Rep. 47, 48 (citing In re Marriage of McLean/Fleury (1993), 257 Mont. 55, 61, 849 P.2d 1012, 1015). "If substantial credible evidence supports the court's findings and judgment, this Court will uphold the district court's decision unless there is an abuse

7

of discretion." Nordberg, 877 P.2d at 991. Substantial evidence is defined as "evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Harrettv. Asarco Inc. (1990), 245 Mont. 196, 200, 799 P.2d 1078, 1080.

Distribution of the marital estate is determined by the guidelines in § 40-4-202(1), MCA, which provides in part:

> In a proceeding for dissolution of a marriage . . . the court, without regard to marital misconduct, shall . . . finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both.

This language indicates that the court must consider all of the shares in both ranch corporations in dividing the marital estate. In re Marriage of Herron (1980), 186 Mont. 396, 608 P.2d 97. The statute continues:

> In dividing property acquired prior to the marriage; property acquired by gift, bequest, devise, or descent . . . property acquired before the marriage or in exchange for property acquired by gift, bequest, devise, or descent: the increased value of property acquired prior to marriage; and property acquired by a spouse after a decree of legal separation, the court shall consider those contributions of the other spouse to the marriage, including:
>         (a) the nonmonetary contributions of a homemaker;
>         (b) the extent to which such contributions have facilitated the maintenance of this property; and
>         (c) whether or not the property division serves as an alternative to maintenance arrangements.

Section 40-4-202(1), MCA.

This part of the statute sets forth the criteria for equitable distribution of the marital estate. The statute requires the court

8

to consider the contributions of the nonacquiring spouse including the nonmonetary contributions of a homemaker. In re Marriage of Jorgensen **(1979),** 180 Mont. 294, 299, 590 **P.2d** 606, 610. The statute grants the district court broad discretion to apportion the marital estate equitably to each party under the circumstances. Nordberg, 877 **P.2d** at 991 (citing In re Marriage of Zander **(1993),** 262 Mont. 215, 221, 864 **P.2d** 1225, 1230).

We have held that **"[i]f** the contribution of the non-owning spouse has not facilitated the maintenance of property brought into the marriage by the other spouse, the district court may exclude that property from the marital estate." In re Marriage of Gallagher **(1991),** 248 Mont. 100, 809 **P.2d** 579; see **Jorgensen,** 590 **P.2d** at 609-10. However, prior acquired and gifted property may be included in the marital estate but only after the court has considered the contributions of the other spouse, including the nonmonetary contributions of a homemaker. If the contributions of a homemaker have facilitated the maintenance of the property, the court **may** include that property in the marital estate for distribution. Lewis v. Lewis **(1982),** 198 Mont. 51, 54, 643 **P.2d** 604, 606; Jorgensen **(1979),** 180 Mont. 294, 299, 590 **P.2d** 606, 610; see also In re Marriage of Staudt **(1985),** 216 Mont. 196, 700 **P.2d** 175.

The court held that Margaret was not entitled to any portion of the stock listed in Categories A, B, or C because she had nothing to do with increasing the value of either of the two ranch corporations. By incorporating Mark's proposed findings into its

9

decree, the court adopted his contention that during their 23 year marriage Margaret "did not contribute either as a salaried employee of the Davies Ranch or as a wife or as a mother in any way that resulted in actual maintenance of the value of any of the stock interests that [Mark] received through gift and or inheritance."

The record does not support the court's finding. During the 19 years Margaret lived on the ranch, she was engaged in the rigorous activities of a ranch wife. Margaret was responsible for the general maintenance of the Davies Ranch house, as well as the cook house. She did the yard work and landscaping on the family residence, and supervised three extensive renovations. Margaret's work as a ranch hand during round-ups included: bottle feeding calves, vaccinating and cooking during branding time, weighing cattle, operating scales at the stock yard, and riding as a herder during the grazing round-up.

In addition, she fed the horses and the cattle, plowed winter roads, drove a grain truck to get pellets, purchased ranch groceries, and drove to town to pick up parts and supplies. Margaret babysat the children of employees and drove employees to medical appointments.

Margaret sewed and cooked for the family, drove the children to school, and participated in their school and extra-curricular activities. Included in these activities were: coaching little league, running school track meets, serving as president of the Chinook PTA and as a 4-H sewing leader. She is also a former president, vice president, secretary-treasurer, and state director

10

of the Cowbelles, the auxiliary to the Montana Stockgrowers Association. Mark acknowledged that because Margaret was involved in the above activities he was free to devote his time to ranching.

This Court has often considered the effect of the nonmonetary contributions of a homemaker on the marital estate. In Maedje, 868 P.2d at 583, we held that the wife was entitled to one-half of the appreciated value of two properties the husband brought to the marriage. The wife contributed to the maintenance and appreciation of these assets by remodeling and painting buildings on the various properties, performing daily housekeeping duties, and keeping the marital financial records.

In In re Marriage of Westland (1993), 257 Mont. 169, 848 P.2d 492, the wife raised the children, maintained the home, fed the ranch hands, and served as a ranch hand and a bookkeeper. We concluded that the district court did not err in awarding the wife a portion of the property the husband brought to the marriage because the wife's contribution clearly facilitated the maintenance and growth of all marital assets.

In Larson v. Larson (1982), 200 Mont. 134, 649 P.2d 1351, we held that the district court erred in its evaluation of the marital estate by excluding the husband's prior acquired property. We found that while the wife's homemaking services and nonmonetary contributions may not have been rendered in the field, she was the primary care provider for the couple's children. This allowed the husband to maintain his ranch duties without taking time from those duties to care for his children.

In In re Marriage of Miller (1989), 238 Mont. 197, 777 P.2d 319, the wife cared for the family home, raised three children, assisted in various farm duties, and worked outside the home at various jobs. We held that the lower court abused its discretion in finding that the wife's contributions to the farm and ranch operation were negligible.

In In re Marriage of Jacobson (1979), 183 Mont. 517, 600 P.2d 1183, the wife performed the duties of a ranch wife for over 25 years. Although she did not participate in the outside work, she cared for the couple's two sons, devoting significant time to their completion of school. In addition, she kept the ranch books and occasionally drove to town to pick up supplies. This Court affirmed the district court's finding that the parties made equal contributions to the marital estate.

In In re Marriage of Glass (1985), 215 Mont. 248, 697 P.2d 96, the husband argued that the district court unrealistically inflated the value of the wife's nonmonetary contribution to the marital estate. We affirmed the district court. The wife worked on the ranch for several years. Even after she moved to town, she still contributed to the marital estate as homemaker, wife, and mother.

The rule is settled that an equitable distribution does not require a 50/50 distribution of the marital assets. Nordberg, 877 P.2d at 992; In re Marriage of Bowman (1987), 226 Mont. 99, 734 P.2d 197. It is equity, not equality, that guides a court's discretion in dividing the marital estate. In re Marriage of Fitzmorris (1987), 229 Mont. 96, 745 P.2d 353. The record shows

12

that Margaret spent 19 years performing the duties generally associated with those of a ranch wife. Those contributions as a homemaker facilitated the maintenance of the property listed in Categories A, B, and C and there is no substantial credible evidence to the contrary.

We hold that the District Court erred in dividing the marital estate including its refusal to award Margaret a portion of the cash value of Mark's stock in two closely held family corporations.

We remand for further proceedings to determine an equitable distribution of the marital estate in accordance with this opinion.

<u>ISSUE 2</u>

Did the District Court err in discounting the values of stock in the closely held corporations?

The District Court discounted the value of Mark's stock in the two ranch corporations by 50 percent pursuant to restrictive stock agreements. Margaret argues that the court's valuation of the stock ignores the underlying value of the corporation. In addition, Margaret asserts that although Mark is a minority shareholder, he runs the day-to-day operation of both ranch corporations, and therefore, the discount does not reflect Mark's ability to control both corporations.

Mark is a minority shareholder in both closely held ranch corporations. Mark argues that as a minority shareholder his power is limited to the voting power of his percentage of shares. The record shows otherwise.

13

Mark was named president of the Davies Ranch and vice-president of the S BAR B Ranch by resolution of their respective boards of directors. Each resolution invests in Mark identical powers. Mark is authorized to borrow money, to purchase equipment, to execute notes, and to sell or assign any corporate property. The court found that Mark had been granted broad powers. Joyce Davies, Mark's mother, testified that Mark ran the day-to-day operations of the ranch.

We have previously approved the practice of discounting stock in a closely held corporation. In re Marriage of Milesnick (1988), 235 Mont. 88, 765 P.2d 751. However, a district court need not discount the stock in a close corporation in all instances. Milesnick, 765 P.2d at 757; see In re Marriage of Johnston (1986), 223 Mont. 383, 726 P.2d 322; In re Marriage of Buxbaum (1984), 214 Mont. 1, 692 P.2d 411. "A discount for a minority interest is appropriate when the minority shareholder has no ability to control salaries, dividends, profit distribution, and day-to-day corporate operations." Milesnick, 765 P.2d at 757.

In In re Marriage of Danelson (1992), 253 Mont 310, 833 P.2d 215, we addressed the issue of discounting the value of stock held in two ranch corporations. In the first trial, the district court discounted the value of the stock by 40 percent. In the second trial, the district court refused to discount the net value of the stock. We affirmed. The district court found that the husband had and would continue to have full control over the corporate affairs,

14

and that the husband had no intention of selling or otherwise disposing of the corporation.

In Johnston, 726 P.2d at 322, we held that the district court did not err when it failed to discount the minority stock in a ranch corporation. A discount would not have accurately reflected a minority stockholder's lack of ability to control salaries, dividends or other corporate benefits. Also, the shares were valued by looking to the underlying value of the corporation. Johnston, 726 P.2d at 325.

We have held that discounting is appropriate when the market value of the stock is being estimated because there is no market value on which to rely. Buxbaum, 692 P.2d at 414. In the present case, the value of the corporation was determined by the value of the underlying assets, and it would be inconsistent to discount the minority share of the value of the corporate assets. Buxbaum, 692 P.2d at 414.

Mark relies on Jorgensen, 590 P.2d at 606, to support his argument that the discount was proper. In Jorgensen, the stockholders in a closely held family corporation entered into a written agreement restricting the sale of shares to remaining shareholders and fixing the price per share at $750. We affirmed the district court's valuation of $750 as set forth in the restrictive agreement. However, Jorgensen is distinguishable from the present case in that the restrictive agreement in Joraensen set a dollar value for the stock, rather than discounting it by a percentage. At trial, the court heard expert testimony as to the

15

value of the stock. The expert established a range of $600 per share to $1300 per share. Evidence was admitted of a third-party offer to purchase the company at $600 per share. We held that given the range of values offered as evidence, the district court did not abuse its discretion in fixing the value of the shares at $750. However, setting a dollar value per share in a restrictive agreement is different than setting a percentage discount. By setting the value per share at $750, it is possible that the wife received the actual value, and perhaps more, of the underlying assets. Had the value of the minority shares been discounted by a percentage, the wife would never have received the actual value of the underlying assets. As opposed to being a case about the appropriateness of discounting the underlying value of stock, Jorgensen addresses the reasonableness of the dollar value assigned to minority shares pursuant to a restrictive agreement.

The record shows that Mark had broad powers regarding financial decisions made for both corporations. It is clear that Mark ran the day-to-day operations of both ranches. Mark testified that he intends to continue managing the ranching corporations until he retires, and that he has no intention of selling his shares of stock. The underlying value of the corporations is not in question. The parties stipulated as to those values. Discounting the value of the minority shares by 50 percent was inappropriate.

In Issue 1, we held that Margaret is entitled to a portion of the cash value of the stock in the two ranch corporations.

16

Margaret is also entitled to the actual underlying value of that stock, rather than the discounted value.

We hold that the District Court erred in discounting the value of stock in a closely held corporation, and we remand for a determination in accordance with this opinion.

## ISSUE 3

Did the District Court err in its award in the amount and duration of maintenance?

This Court will not reverse the district court's award of maintenance unless the findings are clearly erroneous. In re Marriage of Eschenbacher (1992), 253 Mont. 139, 142, 831 P.2d 1353, 1355; In re Marriage of Eide (1991), 250 Mont. 490, 493, 821 P.2d 1036, 1037.

In awarding maintenance, the district court is governed by § 40-4-203, MCA, which provides in part:

> (2)  The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to marital misconduct, and after considering all relevant facts including:
> (a) the financial resources of the party seeking maintenance, including marital property apportioned to him . . . .

The statute provides that the district court must consider the amount of marital property apportioned to the party seeking maintenance. We remand the issue of maintenance for further consideration by the District Court.

## ISSUE 4

Did the District Court err in allowing Mark to call a vocational expert?

17

The court allowed Mark's counsel to call a vocational rehabilitation expert to rebut Margaret's testimony as to her unemployability. Margaret's counsel objected because the expert was not named in discovery responses. The court called for a continuance and allowed counsel for both parties to interview the expert.

Our standard of review relating to discretionary trial court rulings is whether the trial court abused its discretion in allowing the evidence. Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 475, 803 P.2d 601, 603-04.

There is nothing in the record to suggest that the trial court abused its discretion in allowing the evidence.

We hold that the District court did not err in allowing Mark to call a vocational expert.

<u>ISSUE 5</u>

Did the District Court err in refusing to admit Exhibit DDD?

The court refused to admit Exhibit DDD, a diary offered as proof of Margaret's contribution to the operation of the ranches and maintenance of the marital assets.

Our standard of review relating to discretionary trial court rulings is whether the trial court abused its discretion in allowing (or not allowing) the evidence. <u>Steer,</u> 803 P.2d at 603-04.

The court determined that the material contained in the diary was a written record of the detailed testimony Margaret had just

18

delivered and was unnecessary. There is no evidence in the record to show that the court abused its discretion.

We hold that the District Court did not err in refusing to admit Exhibit DDD.

<u>ISSUE 6</u>

Did the District Court err in awarding Margaret her attorney fees without holding a separate hearing after the trial?

Reasonable attorney fees are allowed if both parties' financial resources are considered. <u>Buxbaum,</u> 692 **P.2d** at 415; Section 40-4-110, MCA.

> An award of attorney fees must be based on a hearing allowing for oral testimony, the introduction of exhibits, and an opportunity to cross-examine in which the reasonableness of the attorney fees claimed is demonstrated.

In re Marriage of Aanenson **(1979),** 183 Mont. 229, 236, 598 **P.2d** 1120, 1124.

We hold that the District Court erred in awarding Margaret her attorney fees without holding a separate hearing after the trial, and we remand for a determination in accordance with this opinion.

Affirmed in part, reversed in part, and remanded for further proceedings.

_____
Justice

19

We concur:

_____

_____
          **Justices**

Justice James C. Nelson, specially concurring.

I concur in the result reached by the Court in this case not only for the reasons set forth in our opinion, but also for an additional reason not discussed.

We have time and time again paid lip service to the oft-stated but usually ignored rule that, while not error per se, district courts should not adopt verbatim the findings of fact and conclusions of law of the prevailing party. In re Marriage of Nikolaisen (1993), 257 Mont. 1, 5, 847 P.2d 287, 289 (citing In re Marriage of Hurley (1986), 222 Mont. 287, 295-96, 721 P.2d 1279, 1285). The reason underlying the rule is that "[e]rror occurs when the court accepts one party's proposed findings of fact without proper consideration of the facts and where there is a lack of independent judgment by the court." In re Marriage of Kukes (1993), 258 Mont. 324, 328, 852 P.2d 655, 657 (citing In re Marriage of Callahan (1988), 233 Mont. 465, 472, 762 P.2d 205, 209).

This case presents a perfect illustration of what happens when the rule is observed in the breach. Here, the District Court adopted by reference a fourteen page portion of the proposed findings of fact submitted by counsel for Mark and simply photocopied and attached those as Exhibit A to the court's Findings of Fact, Conclusions of Law, and Decree of Divorce. Included in Exhibit A appears the following:

> The court further finds that Margaret Davies should be awarded maintenance for a specified period of time to encourage and impress upon her that it is necessary for her to get on with her life and to stop looking to her husband and the court for unrealistic expectations.

21

In making the division of property, the court has considered the matters stated in Section 40-4-202, MCA [sic] in making the determination of maintenance the court has considered the matters stated in Section 40-4-203, MCA. The court finds that Margaret Davis is a pleasant appearing attractive person who has the ability both physically and emotionally to acquire continuing commercial education and training to enable her to find appropriate employment, in addition to the education and training that she has already received. [Emphasis added.]

It is bad enough when attorneys inject gender bias and sexual stereotyping into legal proceedings: it is unacceptable when the court wholly or partially premises its decision on such erroneous preconceptions. While that was, perhaps, not the court's intention in the instant case, nevertheless, in adopting verbatim, by reference, Mark's counsel's view that the wife's physical appearance should play some part in resolving property distribution and maintenance issues, the court has made that insupportable proposition its own.

Like other courts and organized bars, this Court and the Montana State Bar have recognized the harm caused by gender bias and sexual stereotyping in court proceedings. To that end, this Court has appointed a Gender Bias Task Force which is charged with the duty of examining "the extent to which gender bias . . . affects participants in the judicial system, such as . . . litigants . . . and members of the public who come into contact with the courts of Montana." In the Matter of the State Bar of Montana's Gender Fairness Steering Committee, No. 90-231 (1990) (Petition and Order).

While that task force has not completed its report, it is safe to say that if attorneys and members of the judiciary entertain

22

preconceptions about a party because of the party's gender, and worse, then act upon those stereotypes, the entire legal process is invariably tainted and debased.

Article II, Section 4 of our Montana Constitution recognizes and guarantees the individual dignity of each human being without regard to gender. Every attorney and every judge in Montana is sworn to uphold that constitutional right. Attorneys: Section 37-61-207, MCA; Judges: Art. III, Sec. 3, Mont. Const., and § 2-16-211, MCA. There is simply no justification for injecting gender bias and sexual stereotyping into any legal proceeding in this state. It is morally wrong: it violates the constitution; it will not be tolerated.

While Mark's counsel argues that his--and by adoption, the court's--comments were "complimentary and encouraging," I suggest that few women would agree. I suspect that most women would find such statements demeaning and patronizing. I wonder what the reaction would have been if the court had concluded that Mark should get substantially less property because he is a good looking guy and, by implication, will likely find a new wife; that he should stop whining: and that he should get on with his life.

In its Petition to the Supreme Court, the State Bar of Montana's Gender Fairness Steering Committee listed four forms of gender bias: a) denying rights on the basis of gender: b) subjecting people to stereotypes about the proper behavior of men and women which ignore their individual situations: c) treating people differently on the basis of gender in situations in which gender should be irrelevant; and d) subjecting men and women as a

23

group to a legal rule, policy, or practice which produces worse results for them than for the other group. All four forms of gender bias are implicated in any decision in which the counsel and the court litigate and decide issues wholly or partially on the basis of the physical appearance and attractiveness of one of the litigants.

The various sections of the Montana Uniform Marriage and Divorce Act and our substantial body of case law set forth in detail the legal requirements under which matters of property distribution, maintenance, custody, support and visitation are to be litigated and decided in dissolution actions in this state. Gender bias and sexual stereotyping have absolutely no part in the process; they are not part of the equation. The court has no obligation to, and, indeed, may not favor the female litigant in order to protect "the little woman;" nor is it proper for the court to disadvantage the female party by wholly or partially deciding contested dissolution issues on the basis that she is physically attractive and, by implication, will likely remarry soon. Moreover, it is patently improper that counsel suggest that the court should do so.

Simply put, gender bias and sexual stereotyping have no place in the jurisprudence or in the courtrooms of this state. The fact that such misconceptions were improperly injected into this case lends further support to our decision here. Accordingly, I concur.

_____
Justice

24

Justice Karla M. Gray joins in the foregoing special concurrence of Justice James C. Nelson.

_____
Justice