Filed 5/1/25  Marriage of Andary CA6
Opinion after vacating prior opinion

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of VICKI LYNN ANDARY and SAM G. ANDARY. | H051824<br>(Santa Clara County<br> Super. Ct. No. 18FL000026) |
| VICKI LYNN ANDARY,<br><br>     Respondent,<br><br>     v.<br><br>SAM G. ANDARY,<br><br>     Appellant. | |

The parties, Sam Andary and Vicki Andary, married in August 1998.[1]  They separated in December 2017, and the following month Vicki petitioned for divorce.  Sam and his brothers own companies that operate gas stations and hold the underlying properties.  A key issue in dividing the marital estate is the characterization and valuation of these companies.  After appointment of a temporary judge, a bifurcated trial encompassing these issues was held, and sitting as the trial court, the judge issued a statement of decision.

---

[1] For purposes of clarity, after initial introduction, we refer to the parties and to Sam Andary's brothers by their first names.  No disrespect is intended.

Sam appeals several aspects of the trial court's statement of decision: the characterization of Andary Enterprise, Inc. (AEI), which was formed during the parties' marriage, as community property; valuation of AEI and, TABS, Inc. (TABS), a business formed by the Andary brothers before the parties' marriage; and the award of a community interest in TABS' operations after the parties' separation. As explained below, we affirm the trial court's characterization and valuations but vacate the award of a post-separation community interest in TABS.

## I. BACKGROUND[2]

### A. The Andary Brothers' First Gas Station

In 1989, nearly a decade before the parties married, Sam's brother Albert Andary began operating a gas station franchise named "Al's Exxon" on Mowry Avenue in Fremont, California (Mowry). Although Albert was the only named franchisee, Sam and his brothers Tony Andary and Bill Andary were "silent investors," and the four brothers held equal 25 percent shares in the business. In 1993, when Exxon sought to terminate franchise agreements with Al's Exxon and others, Albert and other franchisees successfully sued Exxon, which then agreed to retain the Al's Exxon franchise.

### B. TABS

In June 1997, a year before the parties' marriage, Sam, Albert, and Bill incorporated TABS, a name formed using the first initials of the Andary brothers (Tony, Albert, Bill, and Sam). TABS took over from Albert as the franchisee for the Mowry gas station. Although only Sam, Bill, and Albert were initially listed as owners, the brothers testified that Tony was a "silent" owner. In 2014, Tony was formally included in the ownership of TABS, and each brother thereafter formally owned equal 25 percent

---

[2] Respondent filed a motion to augment the record on appeal. We granted the motion as to the first three items attached to it, and as to the remaining attachments we deemed the motion to be one to take additional evidence, which we deferred for consideration with this appeal. We now deny respondent's motion as to the remaining attachments.

interests in the company. After Albert passed away in 2017, his shares passed to his widow and trusts for his children.

In December 1997, TABS took over a second Exxon gas station franchise, which was located on Thornton Street in Newark, California (Thornton). Two years later, after Exxon divested its California retail operations, TABS entered into a gasoline supply agreement with Exxon's successor in retail gasoline marketing in California, Valero Refining Company (Valero).

## C. AEI

In December 2000, two years after the parties' marriage, Sam and his brothers incorporated AEI, with each brother holding an equal 25 percent share. Under state and federal law, as a franchisee, TABS had a right of first refusal, which allowed it to purchase the properties containing the Mowry and Thornton gas stations if Exxon sought to sell those properties. AEI was formed for the purpose of owning the properties.

In March 2001, TABS executed an agreement with Valero to purchase the Mowry property and provide a 5 percent escrow deposit. BNY Western Trust Company (BNY), which held title to the property, executed a bill of sale for personal property with AEI as the purchaser, and in May 2001 BNY transferred ownership of the Mowry real property to AEI. The purchase was financed by a loan which was secured by the property with both AEI and TABS as guarantors. AEI, however, made all payments on the loan. Before taking title, AEI signed a 15-year lease renting the Mowry property to TABS.

AEI acquired the Thornton property in the same manner. In March 2001, TABS executed an agreement with Valero to purchase the property and provide a 5 percent escrow deposit. In May 2001 BNY signed a corporate grant deed transferring ownership of the Thornton property to AEI. Once again, the purchase was financed by a loan which was secured by the property with both AEI and TABS as guarantors, and AEI made all payments on the loan. Finally, AEI signed a 15-year lease renting the Thornton property to TABS.

Nearly 12 years later, in February 2013, the Andary brothers acquired a gas station located on South Bascom Avenue in San Jose, California (Bascom). The gas station's equipment and personal property were transferred to TABS, and ownership of the underlying real property to AEI. Unlike the Mowry and Thornton properties, acquisition of the Bascom property was partly in cash with the rest financed by the seller in the form of a loan. The loan was secured by a deed of trust, which AEI signed, and AEI made all payments on the loan. As with the Mowry and Thornton properties, AEI granted a 15-year lease for the Thornton property to TABS.

## D. The Statement of Decision

Over five days in 2022 and early 2023, a bifurcated trial concerning the characterization and valuation of TABS and AEI was held. On January 30, 2023, after a series of tentative and proposed statements of decision, the trial court issued a modified final statement of decision.

The modified final statement of decision characterized AEI as community property because it was incorporated during the parties' marriage. In so doing, the trial court found that AEI was not a continuation of the gas station business operated by TABS because AEI had different owners and because AEI conducted a different line of business than TABS, namely, "the ownership and management of rental real estate." Although the trial court recognized that TABS' rights of first refusal in its franchise agreements for the Mowry and Thornton properties were separate property, it determined that the properties themselves were community property because AEI, not TABS, acquired them. The trial court also rejected Sam's arguments that the loans for the Mowry and Thornton properties were extended based solely on separate property assets and that the funds used to purchase the Thornton property could be traced to separate property. The trial court concluded as well that Sam's interest in the Bascom real property was community property. However, the trial court found that TABS provided

4

down payments on the Mowry and Thornton properties and that Sam's portion of these down payments was $16,825.

The trial court also made several findings regarding the valuation of AEI's gas station properties. Although experts for both parties testified that the income capitalization approach was the best method for valuing the properties, their applications of the approach yielded widely disparate results: Vicki's expert calculated the aggregate value of the Mowry, Thornton, and Bascom properties to be $15,830,000, while Sam's expert calculated the value to be only $11,470,000. However, both experts also used the comparable sales approach to calculate the value of the properties, and their calculations using that approach were much closer. Accordingly, the trial court decided to use the comparable sales approach. In addition, because Sam's expert used more comparable sales both in general and in Northern California, the court found his calculations more credible, and taking the average of his high and low values for the properties, the court found that the aggregate value of the properties was slightly over $15 million.

Finally, the trial court made two pertinent rulings concerning the valuation of TABS. First, although the court adopted the valuation of TABS and Sam's interest in it by Sam's expert, it declined to apply a minority discount to Sam's interest because TABS is a family-owned business which is likely to be sold as a unit. Second, although the court found that TABS was separate property, it found that the marital estate had a community interest in TABS because, as of the date of the parties' separation, Sam was undercompensated for his work in the amount of $163,333. In addition, the court found that the community was "entitled to a reasonable rate of return" on this interest from the date of separation until the beginning of the trial in the amount of $23,265.

At Sam's request, the trial court certified that there was probable cause to appeal the modified statement of decision, and this court granted Sam's motion to appeal. (Fam. Code, § 2025 [authorizing certification of issues bifurcated for separate trial]; Code Civ.

5

Proc., § 904.1, subd. (a)(10) [authorizing appeals from orders made appealable by the Family Code.)

## II. DISCUSSION

On appeal, Sam challenges four rulings in the statement of decision: (1) The characterization of AEI as community property, (2) the valuation of AEI's properties, (3) the trial court's refusal to apply a minority discount to Sam's interest in TABS, and (4) the award of a post-separation return on the community interest in TABS. Below, we consider each challenge in turn.

### A. Characterization of AEI

In characterizing Sam's interest in AEI as community property the trial court followed the well-established presumption that assets acquired during a marriage are community property. Sam argues that this presumption is inapplicable or overcome on several grounds. We review the factual findings underlying the trial court's characterization determinations for substantial evidence and its legal rulings de novo. (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 184; *In re Marriage of Finby* (2013) 222 Cal.App.4th 977, 984 (*Finby*); *In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734 (*Rossin*).) As explained below, we conclude that Sam's interest in AEI is community property.

We begin with the general rule governing characterization of community property. California "consistently has provided as a general rule that property acquired by spouses during marriage, including earnings, is community property." (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 12, partially superseded by statute on other grounds as stated in *In re Marriage of Cadwell-Faso and Faso* (2011) 191 Cal.App.4th 945, 958; see also *In re Brace* (2020) 9 Cal.5th 903, 924, 916-927 [noting limitations on applying the presumption to property acquired before 1975].) This general rule is codified in section 760 of the Family Code, which states, "[e]xcept as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the

6

marriage while domiciled in this state is community property." (Fam. Code, § 760.) (Subsequent undesignated statutory references are to the Family Code.) Accordingly, as the Supreme Court recognized long ago, "all property acquired by either spouse during the existence of the marriage is presumed to be community property," and "the burden of overcoming the presumption . . . rests upon the party claiming that the property is separate." (*Estate of Niccolls* (1912) 164 Cal. 368, 371 (*Niccolls*).) In addition, because "all property" means all property, this presumption applies to businesses as well as real and personal property. (*In re Marriage of Motiska & Ford* (2023) 96 Cal.App.5th 1291, 1297-1298; *In re Marriage of Greaux & Mermin* (2014) 223 Cal.App.4th 1242, 1245.)

As the trial court recognized, section 760's presumption squarely applies here. Sam and Vicki were married in 1998 and separated 19 years later in 2017. AEI was incorporated in California in December 2000, about two years after Sam and Vicki married. At all relevant times, Sam appears to have been domiciled in California. Consequently, Sam's interest in AEI was "acquired by a married person during the marriage while domiciled in this state" and therefore "is community property" unless otherwise provided by statute. (§ 760.) In addition, Sam bears the burden of rebutting this presumption and proving that his interest in AEI was his separate property. (*Niccolls*, *supra*, 164 Cal. at p. 371; see also *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1400 (*Valli*) ["A spouse's claim that property acquired during a marriage is separate property must be proven by a preponderance of the evidence."].)

Sam argues that AEI was not created during his marriage but was instead a mere change in the form or identity of TABS, which was formed before the marriage. We disagree. Sam and his brothers did not simply incorporate TABS and rename it AEI. To the contrary, after AEI was incorporated, TABS remained in existence and leased gas stations from AEI. In addition, AEI initially had different formal ownership than TABS. In 2000, when AEI was formed, TABS had three formal owners: Albert, Sam, and Bill. By contrast, AEI was formally owned by Tony as well as his brothers Albert, Sam, and

7

Bill. Finally, and most importantly, AEI did not take over any operations or functions previously performed by TABS because AEI was in a different line of work: "the ownership and management of rental real estate." Consequently, ample evidence supports the trial court's finding that AEI was a separate entity, and not a mere change in the form or identity of TABS.

*In re Marriage of Koester* (1999) 73 Cal.App.4th 1032 (*Koester*) does not suggest otherwise. In *Koester*, a husband formed a sole proprietorship before marrying and, after marrying, incorporated it. (*Id.* at p. 1035.) Invoking "the basic principle that separate property does not change its character because of a change in form or identity," *Koester* held that incorporation did not transform the sole proprietorship into community property. (*Id.* at p. 1037, italics omitted.) This case is distinguishable because Sam and his brothers did not merely change the form or identity of an existing business. Instead, they created a new entity, with new ownership, engaged in new and different operations.

Sam also invokes the well-established exception to the presumption that property acquired during a marriage is community property where the acquired property is "traceable to a separate property source." (*Valli*, *supra*, 58 Cal.4th at p. 1400.) In particular, Sam argues that the funds AEI used to purchase the Mowry, Thornton, and Bascom properties are traceable to separate property because the lender financing the Mowry and Thornton purchases intended to rely on TABS' property in extending credit and because the Mowry and Thornton properties were AEI's only assets when the loan for the Bascom property was made.

We are not persuaded. As Sam correctly points out, when property is acquired by credit during marriage, the character of the acquired property is " 'determined according to the intent of the lender to rely upon the separate property of the purchaser or upon a community asset,' " and the presumption that the property is community property "may be overcome by showing the lender intended to rely solely upon a spouse's separate property and did in fact do so." (*In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179,

1186-1187.) However, Sam has failed to show that the lender relied solely, or even primarily, on separate property. Sam admittedly presented no direct evidence of lender intent. In addition, the deeds of trust securing the loans used to purchase the Mowry and Thornton properties were signed by *both* TABS and AEI, the deeds made the two "jointly and severally" liable, and prior to the close of escrow AEI signed leases for both properties. Sam asserts that "no lender would have extended loans to AEI alone to purchase Mowry and Thornton" because the company was new and had no financial history. However, Sam presented no evidence supporting this assertion, and in determining whether the trial court's contrary finding was supported by substantial evidence, we must "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

Invoking the "inception-of-title" theory, Sam argues as well that the Mowry and Thornton properties are separate property as both were acquired because TABS exercised rights of first refusal obtained before marriage. This argument fails because the inception-of-title theory applies only when an indefeasible equitable right or interest was acquired before marriage, which is not the case here.

Sam's inception-of-title argument is based on *In re Marriage of Joaquin* (1987) 193 Cal.App.3d 1529 (*Joaquin*), which in turn derived the theory from a 1952 Court of Appeal decision, *Giacomazzi v. Rowe* (1952) 109 Cal.App.2d 498 (*Giacomazzi*). (See *Joaquin*, at pp. 1532-1533 [citing *Giacomazzi*]; see also 11 Witkin, Summary of Cal. Law (2024 ed.) Community Property, § 7 [discussing *Giacomazzi*].) Under *Giacomazzi*, " '[t]he status of property as separate or community property is fixed as of the time when it is acquired,' " and it extends to " 'the incipiency of the right by virtue of which the title is finally extended and perfected.' " (*Giacomazzi, supra,* 109 Cal.App.2d at p. 500.) Accordingly, " 'property to which one spouse has acquired an equitable right before marriage is separate property, though such right is not perfected until after

9

marriage . . ..' " (*Ibid*.) However, when a husband "had merely an inchoate right, such as a contract to purchase" a property, and purchased that property during marriage using community funds, "the property so acquired became community property." (*Id*. at p. 501.)

Here, TABS had a right—the right of first refusal of gas station franchisees when their franchisors decide to sell the property on which a gas station is located—that it obtained before Sam's marriage. However, a right of first refusal is merely a "conditional" or "preemptive" right. (*Campbell v. Alger* (1999) 71 Cal.App.4th 200, 206-207; see *Pellandini v. Valadao* (2003) 113 Cal.App.4th 1315, 1322.) It does not become exercisable until the condition is satisfied, that is, unless and until the owner decides to sell the property. (*Nelson v. Reisner* (1958) 51 Cal.2d 161, 166; see also 1 Miller & Starr, Cal. Real Estate (4th ed. 2024) § 2:15, p. 825, fn. omitted [Where a buyer has a right of first refusal, "[i]f the owners decide not to sell, the buyer cannot compel a sale."].) Consequently, TABS did not obtain even a right to purchase the properties underlying the Mowry and Thornton stations until Exxon's merger and divestment to Valero in or around 2000, two years after Sam's marriage. Under the inception-of-title theory, a right of first refusal that was acquired before marriage but was contingent on an event outside the holder's control and that event did not occur until after marriage is not sufficient to establish a separate property interest.

*Joaquin*, *supra*, 193 Cal.App.3d 1529, does not help Sam. In that case, a husband signed a lease for farmland before marriage that included an option to renew, which the husband exercised during the parties' marriage. (*Id*., at pp. 1531-1532.) *Joaquin* held that the renewed lease was separate property under the inception-of-title theory because "title to the property, at least in equity, was acquired at the time the option was originally given," and therefore the option created an equitable interest "relating back to the time the option was given." (*Id*. at p. 1533; see also *Rollins v. Stokes* (1981) 123 Cal.App.3d 701, 711 ["once appellant exercised his option, the right to acquire the property related

10

back to the time of the giving of the option"].)  This holding does not help Sam because "[a] right of first refusal is not the same as an option contract."  (*Corrie v. Soloway* (2013) 216 Cal.App.4th 436, 445, fn. 6].)  According to *Joaquin*, "an option is an indefeasible right in the optionee to have real property transferred to him upon his performance of a condition . . . ."  (*Joaquin*, *supra*, 193 Cal.App.3d at pp. 1532-1533.)  By contrast, "a right of first refusal . . . is a *conditional* option" (*Smyth v. Berman* (2019) 31 Cal.App.5th 183, 192), which " 'does not become an option to purchase until the owner of the property voluntarily decides to sell the property and receives a bona fide offer to purchase it from a third party.' "  (*Hartzheim v. Valley Land & Cattle Co.* (2007) 153 Cal.App.4th 383, 387.)  As Exxon did not decide to sell the gas station properties until 2000, TABS did not obtain an indefeasible right to purchase the gas station properties until that time, which was two years after Sam married.  Consequently, under the inception-of-title rule Sam's interest in the gas station properties was community property.

Finally, Sam asserted at oral argument that corporate transformation, tracing, and inception-of-title combine to compel the conclusion that the gas station properties were separate property.  However, Sam failed to support this assertion with any precedent or principle.  We therefore conclude that the trial court properly applied the general rule that property acquired during marriage is community property and characterized Sam's interest in AEI as such.

## B. Valuation of AEI's Properties

In addition to challenging the characterization of his interest in AEI as community property, Sam challenges the trial court's valuation of AEI's primary assets: the Mowry, Thornton, and Bascom properties.  The trial court valued these properties at slightly over $15 million.  Sam contends that the trial court abused its discretion by using a method—the comparable sales approach—not favored by either of the experts on gas station valuation retained by the parties.  However, trial courts have broad discretion in valuing

11

property and choosing valuation methods. Moreover, in light of the sharp disparity between the calculations of the experts using the income capitalization approach, the trial court had good reason to infer that in this case the approach was unreliable and adopt a different approach instead.

Because community assets generally must be divided equally upon dissolution of marriage (§ 2550), trial courts presiding over such actions often must value businesses and other assets. (*In re Marriage of Honer* (2015) 236 Cal.App.4th 687, 693-694 (*Honer*); see also *Finby*, *supra*, 222 Cal.App.4th at pp. 984-987 [valuing wife's book of business]; *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670-671 [valuing husband's law practice].) When businesses are closely held, they may be difficult to value. (See, e.g., *In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, 888 (*Hewitson*).) Nevertheless, because valuation is a factual issue, courts exercise broad discretion in determining value, and those determinations will be upheld on appeal so long as they are supported by substantial evidence. (*Rossin*, *supra*, 172 Cal.App.4th at p. 734; *In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572.) In exercising this discretion, "[t]he trial court is not required to accept the opinion of any expert as to the value of an asset" (*In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 753), and even when an expert's opinion is uncontradicted, the court may select any valuation "within the range of the evidence presented." (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 88; see *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 631-632 (*Duncan*); *In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 820.) Moreover, when there are several potential approaches to valuing a business or property, "the court must determine which of the recognized valuation approaches will most effectively achieve substantial justice between the parties." (*Duncan*, *supra*, at p. 632; see *In re Marriage of Gray* (2007) 155 Cal.App.4th 504, 514.)

Here, the trial court reasonably chose to use the comparable sales approach to value the gas station properties owned by AEI. Both Sam's expert and Vicki's expert

12

recognized that the sales comparison approach is a valid, traditional method for valuing real property. Indeed, both used the comparable sales approach in their reports to calculate the value of the properties at issue. Moreover, the experts were able to find over 40 sales of comparable gas stations in California, including 14 from Santa Clara and other Bay Area counties from 2020 to 2022. And their valuations using the comparable sales method were fairly similar to those reached using another traditional appraisal method (the costs approach).

Although both experts testified that another method—the income capitalization approach—is ordinarily better for valuing gas station properties, neither expert opined that the comparative sales approach was inappropriate, and the trial court had good reason to doubt the reliability of the income capitalization approach in this case because the determinations reached using it varied widely. For example, using the income capitalization approach, Vicki's expert valued the Mowry property at $6.63 million, while Sam's expert valued it at only $4 million, a difference of nearly 40 percent. The valuations of the Thornton property using the income capitalization approach also differed greatly: Vicki's expert valued the property at $5.57 million, and Sam's expert at $4.06 million, a difference of more than 25 percent. (By contrast, the valuations of the Bascom property were relatively similar: $3.49 million and $3.41 million.) The valuations of Sam's expert using the income capitalization approach also varied widely from his valuations under the costs approach: $5.63 million versus $4 million for Mowry and $4.52 million versus $3.41 million for Bascom, a disparity that both experts agreed was unusual.

The valuations using the sales comparison approach were much closer. Using this approach, Vicki's expert calculated the value of the Mowry property to be $6.76 million, and Sam's expert $6.0-$6.4 million. Similarly, under the sales comparison approach, the experts calculated the value of the Thornton property to be $5.89 million and $5.31-$5.5 million, respectively, and the Bascom property to be $2.97 million and

13

$3.4 million, respectively. In light of these more consistent conclusions, it was reasonable for the trial court to decide that in this case the comparative sales approach yielded more reliable results. We therefore conclude that, in choosing the comparative sales approach over the income capitalization approach in this case, the trial court did not abuse its "broad discretion to select a valuation method." (*Duncan*, *supra*, 90 Cal.App.4th at p. 636.)

## C. Minority Discount

Sam also contends that the trial court made several errors in valuing his interest in TABS. The first concerns the trial court's refusal to apply a minority discount to the community interest in TABS (which the trial court found to be approximately $190,000 due to under-compensation during the parties' marriage). One of Sam's experts opined that a 20 percent discount should be applied because Sam owns only a minority interest (25 percent) of the business and therefore lacks control over its operations. Vicki's expert disagreed. He argued that a minority discount is not appropriate here because TABS is family-owned and all the family members have equal interests, which means no one member can control the business. The trial court rejected the minority discount, albeit on slightly different rationale: It determined that a minority discount was inappropriate because, as a family-owned business, TABS presumably would be sold as a unit. As the record supports this determination, we find no abuse of discretion. (See *Maughan v. Correia* (2012) 210 Cal.App.4th 507, 523, fn. 10 (*Maughan*) [reviewing application of minority discount for abuse of discretion].)[3]

---

[3] Citing several out-of-state decisions, Sam contends that the trial court's decision to not apply a minority discount should be reviewed de novo. We disagree. As noted above, valuation is factual in nature (*Honer*, *supra*, 236 Cal.App.4th at p. 694), and, as discussed below, the decision whether to apply a minority discount is no different. The cases cited by Sam deal with the appraisal rights of dissenting shareholders, which are governed by statute and therefore raise legal issues absent here. (See *Lawson Mardon Wheaton v. Smith* (N.J. 1999) 734 A.2d 738, 740 [considering "how a court in a statutory appraisal action should determine the 'fair value' of the shares of stock held by a

In valuing ownership interests in closely held corporations, California courts often look to the guidance provided by the Internal Revenue Service (IRS) for valuing shares in such corporations for estate tax and gift tax purposes. (*In re Marriage of Micalizio* (1988) 199 Cal.App.3d 662, 674 (*Micalizio*) [citing Rev. Rul., 59-60, 1959-1 C.B. 237; *Hewitson*, *supra*, 142 Cal.App.3d at pp. 882-883 [same].) IRS rules recognize that "[t]he size of the block of stock [in a closely held corporation] is . . . a relevant factor to be considered." (Rev. Rul., 59-60, 1959-1 C.B. 237.) For example, "control of a corporation, either actual or in effect, representing as it does an added element of value, may justify a higher value for a specific block of stock." (*Ibid*.) Conversely, if a shareholder has only minority interest and therefore lacks control over the corporation's operations, lack of control may "substantially decrease" the value of the shareholder's block of shares "if they were placed on the open market." (*Brown v. Allied Corrugated Box Co.* (1979) 91 Cal.App.3d 477, 486 (*Allied Corrugated*).) Such " '[a] minority discount adjusts for lack of control over the business entity on the theory that noncontrolling shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions.' " (*Maughan*, *supra*, 210 Cal.App.4th at p. 520.)

However, a minority discount is not always appropriate. (See, e.g., Goldberg, Valuation of Divorce Assets (rev. ed. 2024), § 6:4 & fns. 1, 6 [noting cases finding a minority discount inapplicable]; *id*., § 6:5 & fn. 8, 12 [same].) For example, a minority discount is inappropriate where "shares are to be purchased by someone who is already in control of the corporation." (*Allied Corrugated*, *supra*, 91 Cal.App.3d at p. 486.) Even

dissenting shareholders in a family-held corporation"]; *Rapid-American Corp. v. Harris* (Del. 1992) 603 A.2d 796, 798-799 [considering whether to apply a 'control premium' in an action by dissenting shareholders]; see also *Goles v. Sawhney* (2016) 5 Cal.App.5th 1014, 1019-1020 [holding that minority discounts are not allowed in determining the fair value of a minority interest in a shareholder buyout under Corporations Code section 2000].)

15

more pertinently, a minority discount is inappropriate where the shares at issue are in a corporation that is normally sold as a whole, such as a family-owned business, and no separate sale of minority interests is contemplated. (*Brown v. Brown* (N.J.Super.Ct. App.Div. 2002) 792 A.2d 463, 477 (*Brown*) [declining to impose minority discount where "there is no evidence of a contemplated sale of all or part of the business, forced or otherwise"]; *In re Marriage of Barlow and Barlow* (Or.Ct.App. 1992) 826 P.2d 18, 19 (*Barlow*) [rejecting minority discount in light of testimony that "small family farm corporations are normally sold as a whole" and "no minority sale is planned"]; *Howell v. Howell* (Va.Ct.App. 2000) 523 S.E.2d 514, 521 [rejecting minority discount where "no transfer of the partnership interest was foreseeable and no one . . . exercised majority control"].)

The trial court reasonably concluded that a minority discount was inappropriate for this last reason. TABS is a small family-owned business, in which Sam, his two surviving brothers, and his deceased brothers' family each hold 25 percent interests. Sam presented no evidence that he or anyone else in his family intends to sell their minority interests separately. Nor is there any evidence that other family members combined against Sam and misused their combined authority against him, that family members had any disagreements about strategy, or even that there has been any serious dispute about the distribution or management of TABS' finances. Consequently, there is no reason to believe that Sam or any of his family members will separately sell their minority interests and be forced in such a sale to accept less than proportionate value for their interest. To the contrary, as the trial court recognized, if TABS is ever sold, it is likely to be sold by the family as a whole, with Sam receiving proceeds proportionate to his interest. Consequently, as courts facing similar circumstances have recognized, a minority discount is inappropriate here. (*Brown*, *supra*, 792 A.3d at pp. 477-478]; *Barlow*, *supra*, 826 P.2d at p. 19.)

16

In arguing that the minority discount should have been applied, Sam relies primarily on *In re Marriage of Rosan* (1972) 24 Cal.App.3d 885 (*Rosan*). As Sam notes, *Rosan* observed that "[a]n offer from a third person to purchase a minority interest in a closely held corporation paying no dividends for full 'computed value' would be an unlikely prospect." (*Id.* at p. 890.) However, as just shown, because Sam owns an equal share in a harmonious family-owned business, there is no reason to think that Sam will ever sell his interest in TABS separately to a third person and accept less than the proportionate value of the business. By contrast, *Rosan* did not involve a family-owned business, and the husband in that case did not own an equal share in the corporation. Instead, he owned 15 percent of a corporation, and an unrelated individual owned the remaining 85 percent. (*Id.* at pp. 888, 890.) Consequently, in sharp contrast to here, in *Rosan* there was no reason to believe that the corporation in *Rosan* would be sold as a whole and full value recovered. Another California decision cited by Sam similarly involved a party who owned only 15 percent of a corporation in which an unrelated individual owned 75 percent (and three remaining shareholders collectively owned 10 percent). (*Micalizio*, *supra*, 199 Cal.App.3d at pp. 665.) The third California decision cited by Sam involved a family-owned business, but, in sharp contrast to Sam's apparently harmonious relationship with his family, the family members in that case were suing each other. (*Maughan*, *supra*, 210 Cal.App.4th at pp. 509-510.) Thus, the California decisions cited by Sam are inapposite and cast no doubt on the trial court's decision not to apply a minority discount in this case.

Sam also cites a number of decisions from other jurisdictions. Most are inapposite. Many do not appear to have involved family-owned corporations. (*In re Marriage of Muelhaupt* (Iowa 1989) 439 N.W.2d 656, 661; *In re Marriage of Reiling* (Or.Ct.App. 1983) [673 P.2d 1360, 1362; *Hayes v. Hayes* (Alaska 1988) 756 P.2d 298, 299.) Others involved comparatively small interests in family corporations in which, unlike here, other members held much larger, controlling interests. (*Tofte & Tofte*

17

(Or.Ct.App. 1995) 895 P.2d 1387, 1389 [10.1 percent interest]; *In re Marriage of Belt* (Or.Ct.App. 1983) 672 P.2d 1205, 1207 [nine percent interest]; *Clark v. Clark* (S.C. 2020) 843 S.E.2d 498, 500-501 [25 percent interest of wife in business 75 percent owned by husband].)  In still other cases, the parties disputed the size of the minority discount, but not whether the discount was appropriate.  (*Cross v. Cross* (Wyo. 1978) 586 P.2d 547, 549, fn. 1; *Goemaat v. Goemaat* (Del.Fam.Ct. 1993) 1993 Del. Fam. Ct. LEXIS 72, at pp. *17-18.)  And, in one case, far from holding a minority discount proper, the Montana Supreme Court held that a minority discount in several family ranching corporations was inappropriate because, among other things, the husband "testified that he intends to continue managing the corporations until he retires, and that he has no intention of selling his shares of stock."  (*In re Marriage of Davies* (Mont. 1994) 880 P.2d 1368, 1376.)  Thus, to the extent that the out-of-state cases cited by Sam are similar, they support the trial court's decision to not apply a minority discount.

We therefore conclude that the trial court did not abuse its discretion in refusing to apply a minority discount on Sam's interest in TABS.  In light of this conclusion, we also reject Sam's argument that the trial court should have imposed a minority discount on his interest in AEI.

**D. Post-Separation Increase in Value of TABS**

Sam's final argument on appeal is that the trial court abused its discretion by awarding the community an interest in TABS from the date of separation through the date of trial.  He argues that post-separation efforts on behalf of a business that is separate property are separate property and the court improperly applied the apportionment approach set forth in *Pereira v. Pereira* (1909) 156 Cal. 1 (*Pereira*) in reverse.  We agree that the trial court abused its discretion in allocating to the community a post-separation interest in Sam's portion of TABS, which was his separate property.

During a marriage, "[w]hen a spouse's personal efforts increase the value of his or her separate property business, 'it becomes necessary to quantify the contributions of the

18

separate capital and community effort to the increase' because the 'community is entitled to the increase in profits attributable to [the] community endeavor.' " (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1472 (*Brandes*).)  In calculating the community interest in this situation, courts typically apply one of two approaches.  "*Pereira* is typically applied where business profits are principally attributed to efforts of the community." (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 853 (*Dekker*).)  Under this approach, courts "allocate a fair return to the separate property investment and allocate the balance of the increased value to community property as arising from community efforts." (*Id.*, at pp. 852-853.)  Conversely, *Van Camp v. Van Camp* (1921) 53 Cal.App. 17 (*Van Camp*) is applied where for the most part "the business profits accrued are attributed to the character of the separate asset." (*Dekker*, *supra*, at p. 853.)  Under the *Van Camp* approach, courts "determine the reasonable value of the community's services, allocate that amount to community property and the balance to separate property." (*Ibid*.)  In making such apportionments, courts are "not bound to adopt a predetermined percentage as a fair return" and "may select whichever formula will effect substantial justice between the parties." (*Ibid*.)

At least one decision has applied a "reverse" *Pereira* formula to allocate post-separation increases in value between the community and the separate property estates. (*In re Marriage of Imperato* (1975) 45 Cal.App.3d 432, 439 (*Imperato*), superseded by statute as stated in *Duncan*, *supra*, 90 Cal.App.4th at p. 624.)  Under this approach, the court "allocate[s] a fair return of the increase to the community property and the excess . . . [to] separate property." (*Imperato*, at p. 439.)

Here, applying the *Van Camp* approach to determine the community's interest in TABS between the date of the marriage and separation, the trial court found that the community was undercompensated $163,333.  Then, without specifying that it was doing so, the trial court apparently applied *Imperato*'s reverse *Pereira* formula and awarded Vicki an additional $23,625 reflecting a "reasonable rate of return based on Moody's

19

Triple Annual bond rate" for the period between the date of separation and trial. This additional award, the trial court asserted "meets the goal of achieving substantial justice between the parties."

However, unlike the business at issue in *Imperato*, TABS was not a community property asset, and therefore the post-separation apportionment analysis differs. California community property law recognizes that each spouse's time, effort and skill are community assets and that therefore any benefit derived from that time, effort, and skill belongs to both. (See, e.g., *Beam v. Bank of America* (1971) 6 Cal.3d 12, 17; *In re Marriage of Worth* (1987) 195 Cal.App.3d 768, 773; *In re Marriage of Harrison* (1986) 179 Cal.App.3d 1216, 1226.) However, the "earnings and accumulations of a spouse . . . *after* the date of separation of the spouses, are the separate property of the spouse." (§ 771, subd. (a), italics added; see also § 770, subd. (a).) While the community is entitled to the increase in the value of separate property arising out of Sam's efforts during marriage, the community is not entitled to Sam's post-separation efforts in his separate property. (See *Brandes*, *supra*, 239 Cal.App.4th at p. 1477 ["It is well established that the community's interest in a spouse's separate business is confined to equitable allocation based on the extent to which the spouse's personal efforts resulted in increased value *during* the marriage," italics added.]; *Patrick v. Alacer Corp.* (2011) 201 Cal.App.4th 1326, 1342 (*Patrick*) [wife entitled to one half of community property interest in deceased spouse's separate property business only until his death, and thereafter the business and any increase in value were his separate property]; see also *In re Marriage of Aufmuth* (1979) 89 Cal.App.3d 446, 464-465, disapproved of on another point in *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 858 [holding *Imperato* inapplicable to increase in corporate value unless the husband was the sole shareholder].)

In concluding that the trial court impermissibly allocated the community a post-separation interest in TABS' increased value, we do not address whether a spouse may seek prejudgment interest compensating her for lost use of a community property interest

20

between separation and trial.  (Cf. *Patrick*, *supra*, 201 Cal.App.4th at pp. 1344-1345 [affirming award of prejudgment interest for lost use of share of community property].) In the trial court, Vicki sought the same "separate property return on value" (capitalization omitted) both before and after separation and the trial court awarded a post-separation "rate of return," not pre-judgment interest.

### III.  DISPOSITION

This matter is remanded to the trial court with instruction to vacate finding number 16 in the modified final statement of decision and to conduct further proceedings relating to the community interest in TABS consistent with this opinion.  The modified final statement of decision is otherwise affirmed.  Respondent is entitled to recover costs on appeal.  (Cal Rules of Court, rule 8.278(a)(1), (3).)

_____
BROMBERG, J.

WE CONCUR:

_____
LIE, ACTING P. J.

_____
WILSON, J.

*Andary v. Andary*
H051824